Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

IN THE CIRCUIT COURT FOR THE COUNTY OF ST. LOUIS, MISSOURI
TWENTY-FIRST JUDICIAL CIRCUIT

| | | |
|---|---|---|
| LISA HELTERBRAND, individually and on behalf of all others similarly situated, | ) | |
| | ) | |
| Plaintiff, | ) | Cause No.: |
| | ) | |
| v. | ) | JURY TRIAL DEMANDED |
| | ) | |
| THE PROCTER & GAMBLE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S CLASS ACTION PETITION**

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

# TABLE OF CONTENTS

NATURE OF ACTION .......... 1

PARTIES .......... 1

JURISDICTION AND VENUE .......... 2

FACTUAL ALLEGATIONS .......... 3

DEFENDANT'S PRACTICES ARE UNETHICAL AND VIOLATED ESTABLISHED ETHICAL STANDARDS .......... 20

CLASS ALLEGATIONS .......... 23

COUNT I: Violation of the MMPA By Means of Unfair Practices .......... 26

COUNT II: Violation of the MMPA By Means of Deception .......... 29

COUNT III: Violation of the MMPA By Means of Omission of a Material Fact .......... 30

COUNT IV: Unjust Enrichment .......... 31

PRAYER FOR RELIEF .......... 33

JURY DEMAND .......... 33

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

Plaintiff Lisa Helterbrand brings this action on behalf of herself and all others similarly situated against Defendant The Procter & Gamble Company ("P&G" or "Defendant") and states:

## NATURE OF ACTION

1. P&G manufactures, distributes, and markets numerous toothpastes and mouthwashes under the Crest and Oral-B brands.

2. Under each brand, P&G sells and/or during the class period sold a toothpaste that proximately states on the front of the outside label and the toothpaste tube itself: "Gum & Enamel Repair."

3. The representation that the toothpastes can "repair" gums is false and misleading because, while toothpaste may help control, reduce, or prevent gingivitis, it cannot repair gums, particularly for the over 47% of Americans aged 30 or older who have mild, moderate and severe gum disease called periodontitis.

4. As a result of P&G's false and misleading label regarding the ability of the toothpaste to repair gums, P&G has been able to sell the products to more consumers and for more money than it otherwise would have had the products been properly labeled.

5. Plaintiff Lisa Helterbrand was deceived by these misrepresentations and, as a result, purchased P&G's "Gum & Enamel Repair" toothpaste. Accordingly, she brings this action, including claims for violation of the Missouri Merchandising Practices Act ("MMPA"), § 407.010 *et seq* and unjust enrichment, on behalf of herself and other similarly situated consumers to recover damages caused by this unfair and/or deceptive practice.

## PARTIES

6. Plaintiff Lisa Helterbrand is a citizen and resident of St. Louis County, Missouri.

7. Defendant The Procter & Gamble Company is an Ohio corporation with a principal place of business in Cincinnati, Ohio. P&G manufactures, markets and sells, and/or did

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

so during the Class period, the Crest Gum & Enamel Repair toothpastes (in "Intensive Clean" and "Advanced Whitening" varieties) and Oral-B Gum & Enamel Repair toothpaste (collectively referred to herein as the "Class Products").

**JURISDICTION AND VENUE**

8. This Court has personal jurisdiction over P&G because P&G is authorized to conduct and does conduct business in Missouri. P&G has marketed, promoted, distributed, and sold its products, including the Crest and Oral-B products, in Missouri, has sufficient minimum contacts with this State and/or sufficiently avails itself of the markets in this State through its promotion, sales, distribution and marketing within this State to render the exercise of jurisdiction by this Court permissible, and the claims of Plaintiff and the Missouri consumers she seeks to represent arise out of, derive from, and are otherwise connected with P&G's conduct in Missouri.

9. Venue is proper in the Circuit Court of the County of St. Louis because the cause of action arose in the County of St. Louis. V.A.M.S. 407.025.1.

10. This is a class action filed under Mo Rev. Stat. § 407.025.3(6) and Missouri Supreme Court Rule of Civil Procedure 52.08(b)(2) with respect to the claim for injunctive relief and pursuant to Mo. Rev. Stat. § 407.025.3(7) and Rule 52.08(b)(3) with respect to the claim for actual damages.

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

## FACTUAL ALLEGATIONS

### Gum Disease (Periodontal Disease) Causes Damage to Gums that Cannot be Repaired Without Professional Treatment

11. Gum diseases, called periodontal diseases, "are mainly the result of infections and inflammation of the gums and bone that surround and support the teeth."[1]

12. When someone has periodontal disease, the gum tissue pulls away from the tooth. As the disease worsens, the tissue and bone that support the tooth are destroyed. Over time, teeth may fall out or need to be removed.[2]

13. Periodontal diseases are caused by plaque, a sticky film that is always forming on teeth. Plaque contains bacteria that produce harmful toxins. If teeth are not cleaned well, the toxins can irritate and inflame the gums.[3]

14. If plaque is not removed, it can cause gums (gingivae) to pull away from the teeth, forming pockets in which more bacteria can collect. Plaque that is not removed hardens into tartar, also called calculus, along and under the gums.[4]

15. "The pockets and hard calculus make it difficult to remove plaque without help from a dentist, and periodontal disease can develop."[5]

16. "There are various stages to periodontal disease—from gingivitis (early stage) to periodontitis (advanced disease).

---

[1] Center for Disease Control and Prevention ("CDC"), Periodontal Disease, (July 10, 2013), *available at* https://www.cdc.gov/oralhealth/conditions/periodontal-disease.html (last visited Jan. 21, 2021).
[2] Am. Dental Assoc. Patient Education Content (2012), *available at* http://www.ada.org/en/~/media/ADA/Publications/Files/ADA_PatientSmart_Perio_Disease (last visited Jan. 22, 2021).
[3] ADA Patient Education Content (2012).
[4] What is Gum Disease?,142(1) J. Am. Dental Assoc. 111, *available at* https://www.ada.org/~/media/ADA/Publications/Files/for_the_dental_patient_jan_2011.pdf (last visited Jan. 22, 2021).
[5] *Id.*

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

17. In the early stage of periodontal disease (gingivitis), the gums can become swollen and red, and they may bleed.[6]

18. According to the American Dental Association ("ADA"), at the early stage (gingivitis), the disease may be reversed if caught early and no damage has been done to the supporting structures under the teeth.

19. Reversing gingivitis, however, requires a professional.

20. As the ADA explains, the early-stage gingivitis reversal process involves "a professional cleaning" where the dentist uses a special tool to scrape the hardened calculus and plaque from along and beneath the gum line.[7]

21. P&G's website similarly explains that reversing gingivitis requires "the help of your dentist . . . ."[8]

22. "Even with these measures, some patients develop more severe periodontal disease that must be treated" further and which may require multiple visits. In this treatment, plaque and tartar are carefully removed down to the bottom of each periodontal pocket and the tooth's root surfaces are then smoothed to allow the gum tissue to heal and reattach to the tooth.[9]

23. If early gingivitis is not properly treated, it may lead to a more serious condition called periodontitis, which can do lasting damage to the gums, bones, and other structures that support the teeth.[10]

---

[6] *Id. See also* CDC, Periodontal Disease.
[7] What is Gum Disease?,142(1) J. Am. Dental Assoc. 111; ADA Patient Education Content (2012).
[8] https://crest.com/en-us/oral-health/conditions/gums/gingivitis-symptoms-causes-treatments (last visited Jan. 22, 2021).
[9] ADA Patient Education Content (2012).
[10] ADA Patient Education Content (2012).

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

24. As periodontal disease progresses to its more advanced form, called periodontitis, the gums can pull further away from the tooth, bone can be lost, and the teeth may loosen or even fall out."[11]

25. P&G explains that "[p]eriodontal disease is the main cause of gum recession," which "is when the margin of the gum tissue surrounding the teeth wears away, or pulls back, exposing more of the tooth, or the tooth's root."[12]

26. P&G recognizes that "[r]eceding gums is a widespread dental condition. Most people aren't aware that they have receding gums since it occurs gradually."[13]

27. P&G also recognizes that "[m]ild gum recession can be treated by a professional deep cleaning in the affected area. During the deep cleaning, plaque and tartar is removed and the exposed root area is smoothed over, making it more difficult for bacteria to attach itself. Antibiotics can also be used to kill any remaining bacteria."[14]

28. However, "[i]f a deep cleaning is not sufficient to treat the condition, because of excess loss of bone and deep pockets, receding gums surgery may be required."[15]

29. P&G also acknowledges that brushing, flossing, and visiting the dentist is the "best way to prevent gum recession."[16]

[11] https://www.cdc.gov/oralhealth/conditions/periodontal-disease.html (last visited Jan. 21, 2021).
[12] https://oralb.com/en-us/oral-health/conditions/gums/receding-gums-symptoms-causes-treatments (last visited Jan. 21, 2021).
[13] *Id.*
[14] *Id.*
[15] *Id.*
[16] *Id.*

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

30. While brushing can help prevent further gum recession, it is well accepted that it "won't correct the existing recession."[17] This is because receding gums do not grow back: "Once the gum tissue has pulled back and away from the teeth, it's gone for good."[18]

31. Accepted methods to repair gum recession include professional deep cleaning, gum grafting (a surgical procedure in which a small amount of tissue is transferred to the gum area), and the pinhole surgical technique (a procedure that involves manipulating existing gum tissue over the exposed roots).[19]

**Many Americans Suffer from Gum Disease**

32. According to P&G, "[s]tudies show that 30% of the population may be predisposed to gum disease, even if they take good care of their teeth."[20]

33. According to P&G, "[m]ore than one in three Americans say . . . [t]hey are unaware that periodontal disease needs to be treated and cannot be left alone."[21]

34. According to P&G, gingivitis occurs in 3 out of 4 Americans during their lifetime.[22]

35. According to the CDC, nearly half of U.S. adults over the age of 30 have periodontitis.[23]

---

[17] https://www.colgate.com/en-us/oral-health/gum-disease/can-receding-gums-grow-back (last visited Jan. 21, 2021).
[18] *Id.*
[19] *Id.*
[20] https://oralb.com/en-us/oral-health/conditions/gums/receding-gums-symptoms-causes-treatments (last visited Jan. 21, 2021).
[21] https://crest.com/en-us/oral-health/why-crest/faq/history-toothpaste (last visited Jan. 22, 2021).
[22] https://crest.com/en-us/oral-health/conditions/gums/gingivitis-symptoms-causes-treatments (last visited Jan. 22, 2021).
[23] CDC, Periodontal Disease (*citing* Eke PI, Dye B, Wei L, Thornton-Evans G, Genco R. Prevalence of Periodontitis in Adults in the United States: 2009 and 2010. J Dent Res. Published online 30 August 2012:1–7), abstract available at https://journals.sagepub.com/doi/pdf/10.1177/0022034512457373 (last visited Jan. 21, 2021).

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

36. Periodontitis is more common in men than women, those living below the federal poverty level, those with less than a high school education, and current smokers.[24]

**P&G's Crest Toothpaste**

37. P&G has been selling toothpaste under the Crest brand since the 1950s.[25]

38. P&G markets Crest as "a leader in dental health innovations since its inception in 1955."[26]

39. Currently, P&G sells Crest toothpastes under eight product-lines with the following categories: (1) Future-Proof; (2) Clean + Freshen; (3) Enamel; (4) Sensitivity; (5) All-Around Protection; (6) Kids; (7) Whitening; and (8) Gum Health.[27]




40. P&G offers a variety of toothpastes in its "Future-Proof" line that it advertises as removing plaque along the gum line or defending gums against future issues, such as the following[28]:

[24] *Id.*
[25] https://crest.com/en-us/oral-health/why-crest/faq/history-toothpaste (last visited Jan. 22, 2021).
[26] *Id.*
[27] https://crest.com/en-us/products/compare/crest-toothpaste (last visited Jan. 22, 2021).
[28] https://crest.com/en-us/products/toothpaste/future-proof (last visited Jan. 21, 2021).

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM




41. P&G also offers different toothpastes in its "All Around Protection" line that it advertises as helping to prevent plaque, tartar, and gingivitis, stating that its Pro-Health Advanced Gum Protection Toothpaste provides "Crest's highest level of protection against gingivitis and plaque bacteria to help keep gums healthy," as follows[29]:

[29] https://crest.com/en-us/products/toothpaste/all-around-protection (last visited Jan. 21, 2021).

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM







42. In this "All Around Protection" line, P&G also offers the Crest Pro-Health HD Daily Two Step Toothpaste System, which it describes as a 2-step system that "reduces plaque, polishes, and whitens for superior results"[30]:

[30] https://crest.com/en-us/products/compare/crest-toothpaste (last visited Jan. 21, 2021).

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM




**P&G's Marketing of Crest Toothpaste for Gum & Enamel Repair**

43. P&G also offers different toothpastes in its "Gum Health" line that it advertises on its website as being created after years of research and being specially formulated to reverse early gum disease and issues that come with it, as follows[31]:

CREST GUM CARE COLLECTION

Created after years of research by Crest scientists, these toothpastes have been specially formulated to help reverse early gum disease and the issues that come with it.

[31] *Id.*

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

44. Upon information and belief, in or around April 2018, P&G introduced a new Crest toothpaste in the Gum Health line called "Crest Gum & Enamel Repair."

45. The label on the front of the Crest Gum & Enamel Repair toothpaste box displayed on store shelves and online advertisements, and the toothpaste tube, is shown below[32]:







[32] The first picture is available at https://www.walgreens.com/store/c/crest-gum-&-enamel-repair-toothpaste/ID=prod6383755-product (last visited Jan. 21, 2021). The second picture is available at https://crest.com/en-us/products/toothpaste/gum-enamel-repair-toothpaste-intensive-clean (last visited Jan. 21, 2021).

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

46. P&G has other toothpastes in its "Gum Health" line, such as its "Gum and Breath Purify" toothpaste; "Gum Detoxify" toothpaste; "Gum and Sensitivity" toothpaste; and "Advanced Gum Restore" toothpaste.

47. The label for the "Gum Detoxify" toothpaste states that it "[n]eutralizes plaque bacteria, even around the gum line," and P&G advertisements state that this toothpaste "penetrates hard to reach areas to remove plaque bacteria and helps reverse gingivitis."[33]




CRESTGUM DETOXIFY DEEP CLEAN TOOTHPASTE

4.7/5 ( 314 )

Read All 314 Reviews    Write A Review

Activated foam formula penetrates hard to reach areas to remove plaque bacteria and helps reverse gingivitis.

[33] https://crest.com/en-us/products/toothpaste/crest-gum-detoxify-deep-clean-toothpaste (last visited Jan. 21, 2021).

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

48. The label for the "Gum and Breath Purify" toothpaste states that it provides "[c]linically proven healthier gums," and P&G advertisements state that this toothpaste "combats . . . bacteria at the gum line, for clinically proven healthier gums."[34]




**GUM AND BREATH PURIFY DEEP CLEAN TOOTHPASTE**

4.85/5 ( 52 )

Read All 52 Reviews | Write A Review

Unique formula infused with essential oils combats bad breath bacteria at the gum line, for clinically proven healthier gums.

49. The label for the "Advanced Gum Restore" toothpaste states that it "[p]romotes Gum Healing," and P&G advertisements state that this toothpaste "promot[es] gum healing while fighting gingivitis."[35]

---

[34] https://crest.com/en-us/products/toothpaste/crest-gum-breath-purify-deep-clean-toothpaste (last visited Jan. 21, 2021).

[35] https://crest.com/en-us/products/toothpaste/crest-advanced-gum-restore-deep-clean (last visited Jan. 21, 2021).

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM




**CREST PRO-HEALTH ADVANCED GUM RESTORE TOOTHPASTE, DEEP CLEAN 3.7OZ**

No Review Message

Write A Review

Advanced Amino Acid formula restores gums by promoting gum healing while fighting gingivitis.

**P&G's Oral-B Gum & Enamel Repair Toothpaste**

50. Upon information and belief, in or around November 2017, P&G introduced a new toothpaste under its Oral-B brand called Oral-B Gum & Enamel Repair.



Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

**The Plain, Ordinary, and Reasonable Meaning of "Gum & Enamel Repair" is that the Product Repairs Gums and Enamel**

51. Based on the different varieties of toothpastes in the "Future-Proof" line and P&G's labeling and advertising of same, P&G intended to advertise the Gum Health line as providing benefits other than:

- "remov[ing] . . . plaque along the gum line, teeth, cheeks, and tongue" [Pro-Health Pro/Active Defense Deep Clean];
- "neutraliz[ing] plaque bacteria" [Pro Health Pro/Active Defense Whitening]; or
- "defend[ing] teeth, cheeks, tongue and gums against future issues" [against gingivitis and plaque bacteria" [Pro Health Pro/Active Defense Whitening].

52. Based on the different varieties of toothpastes in the "All Around Protection" line and P&G's labeling and advertising of same, P&G intended to advertise the Gum Health line as providing benefits other than:

- "prevent[ing] plaque, tartar, and gingivitis" [Crest Sensitivity Complete Protection];
- providing the "highest level of protection against gingivitis and plaque bacteria to help keep gums healthy" [Pro-Health Advanced Gum Protection]; or
- providing the "biggest breakthrough in toothpaste since fluoride . . . [that] reduces plaque, polishes, and whitens for superior results" [Pro-Health [HD] Sensitivity].

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

53. Based on P&G's own statements, P&G intended to market its Gum Health line as being specially formulated to reverse early "gum disease and issues that come with it," which would include gum damage, gum recession, and periodontitis.

54. Based on the different varieties of toothpastes in the Gum Health line and P&G's labeling and advertising of same, P&G intended different meanings for the terms:

- "purify" [Gum & Breath Purify];
- "detoxify" [Gum Detoxify];
- "restore" [Pro-Health Advanced Gum Restore]; and
- "repair" [Gum & Enamel Repair].

55. Similarly, P&G labeled and advertised the other toothpastes in the Gum Health line as

- "promoting gum healing" [Gum Restore];
- "fighting gingivitis" [Gum Restore];
- "combat[ing] . . . bacteria at the gum line" [Gum & Breath Purify];
- "remov[ing] plaque bacteria" [Gum Detoxify];
- "neutraliz[ing] plaque bacteria . . . around the gum line" [Gum Detoxify]; and
- "revers[ing] gingivitis" [Gum Detoxify].

56. By offering a different toothpaste in the Gum Health line called Gum & Enamel Repair, P&G intended to suggest that Gum & Enamel Repair toothpaste had different benefits from the other toothpastes in the Gum Health line, or otherwise sold by P&G—namely, the ability to repair gums.

57. The plain and ordinary interpretation of "Gum & Enamel Repair" is that "Gum" and "Enamel" are both objects of the verb "Repair."

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

58. Besides being the most reasonable interpretation, this interpretation is also supported by P&G's labeling of the other toothpastes in the Gum Health line, which include other verbs with one or more objects, such as "Gum Detoxify," "Gum Restore," and "Gum & Breath Purify."

**The Gum & Enamel Repair Label is False or Misleading**

59. Toothpaste ingredients and regular brushing can prevent gingivitis.

60. As set forth above, however, no toothpaste or toothpaste ingredient can repair gums or damage done to gums by periodontal disease.

61. This is because, at every stage of periodontal disease, professional treatment is needed to repair the gums.

62. Accordingly, the prominent representation of "Gum & Enamel Repair" is false and/or misleading.

63. There are no federal requirements specifically addressing the ability of toothpastes to repair gums.

64. When the FDA issued a proposed monograph for labeling of antigingivitis/antiplaque drug products, it did not refer to or address any indications for gum repair.

65. Instead, the FDA's proposed monograph states the indications of an antigingivitis product as helping to:

- "control" "reduce" or "prevent" gingivitis (for antigingivitis products);
- "interfere with harmful effects of plaque associated with gingivitis" (if the product contains stannous fluoride); or

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

- "control" "reduce" "prevent" or "remove" plaque that leads to gingivitis (for antigingivitis/antiplaque products).[36]

66. Repairing gums is materially different from controlling, reducing, and preventing gingivitis or removing plaque that leads to gingivitis.

67. P&G's prominent representation of "Gum & Enamel Repair" on its toothpaste label is deceptive because a reasonable consumer like Plaintiff would expect the product to be capable of repairing gums.

68. Reasonable consumers cannot be expected to know that a toothpaste representing it can repair gums cannot actually repair gums.

**P&G Intended to Mislead Consumers and Thereby Gain a Commercial Advantage**

69. By placing the representation "Gum & Enamel Repair" in large font prominently on the front of the label, P&G intended that consumers would rely on the representation in deciding to purchase the product.

70. P&G intended to profit from the use of the false or misleading label by taking away market share from its competitors, which do not offer a "Gum & Enamel Repair" toothpaste, as shown in the following examples:




[36] 68 Fed. Reg. 103, 32285-86 (proposing 21 C.F.R. § 356.65).

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM










71. The deceptive nature of P&G's false and misleading label is especially egregious when considered in the context of the other toothpastes in the marketplace (including those manufactured, marketed, and sold by P&G)—none of which contain the phrase "Gum & Enamel Repair."

72. In or around July 2018, the Advertising Standards Authority ("ASA"), which is the United Kingdom's independent advertising regulator, banned P&G from running an advertisement for the Oral-B Gum & Enamel Repair toothpaste because the ad's references to "repair" and "restore" suggested the toothpaste could reverse the effects of damaged gums caused by gum disease, and the ad's promotion of the toothpaste's "active repair technology"

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

and claims and representations of "gum rejuvenation" would be understood by viewers as medical claims.[37]

73. Thereafter, despite this ruling, P&G did not alter the label on the Class Products in the United States.

**Plaintiff's Purchase**

74. In or around July 2020, Plaintiff purchased one tube of P&G's Crest Gum & Enamel Repair toothpaste in St. Louis County, Missouri.

75. Prior to making her purchase, Plaintiff was exposed to and read the statement "Gum & Enamel Repair" prominently displayed on the front of the product label.

76. At all times, Plaintiff believed and had a reasonable expectation that the labeling on the products was truthful and accurate.

77. As a direct result of P&G's false and/or misleading "Gum & Enamel Repair" label on the Class Products as set forth above, Plaintiff and other members of the Class have been deprived of the benefit of their bargain in purchasing these products because the products had less value than represented.

78. Consequently, Plaintiff and members of the Class have suffered injury and lost money and property in purchasing the Class Products.

**DEFENDANT'S PRACTICES ARE UNETHICAL AND VIOLATED ESTABLISHED ETHICAL STANDARDS**

79. Defendant's practices of misrepresenting that the Class Products repair gums, as alleged herein, violate generally accepted ethical principles of business conduct.

[37] https://www.asa.org.uk/rulings/procter---gamble--health---beauty-care--ltd-a17-398219.html (last visited Jan. 21, 2021).

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

80. The basis for the allegation that it is unethical to engage in the above practices comes, in part, from established ethical principles recognized by the Direct Marketing Association ("DMA"), the leading industry association for companies that, like Defendant, market directly to consumers, and the American Marketing Association, "the leading organization for marketers [and] the trusted go-to resource for marketers and academics."[38]

**DMA Ethical Guidelines**

81. DMA published principles of ethical business practices in Direct Marketing Association's Guidelines for Ethical Business Practices ("DMA Ethical Guidelines") (2014), Exhibit A, which is incorporated herein by reference.

82. These Ethical Guidelines "are intended to provide individuals and organizations involved in direct marketing in all media with generally accepted principles of conduct." *Id.* at 2.

83. The Ethical Guidelines apply to all marketers, not just those that belong to DMA. DMA states that they "reflect DMA's long-standing policy of high levels of ethics and the responsibility of the Association, its members, *and all marketers* to maintain consumer and community relationships that are based on fair and ethical principles." *Id.* (emphasis added).

84. DMA's Ethical Guidelines are set forth in a series of "Articles," each of which states a separate ethical principle.

85. Article #1 of DMA's Ethical Guidelines is "HONESTY AND CLARITY OF OFFER." It states: "All offers should be clear, honest and complete so that the consumer may know the exact nature of what is being offered …."

86. By misrepresenting that the Class Products repair gums, Defendant violated this principle because its offer, as set forth on the label, was not clear, honest and complete.

[38] https://www.crunchbase.com/organization/american-marketing-association#section-overview (accessed 1/21/2021).

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

87. In July 2018, DMA (then going by the name "Data & Marketing Association") was acquired by the Association of National Advertisers ("ANA"), "one of the oldest and most venerated trade association in the marketing industry."[39] ANA adopted DMA's Ethical Guidelines, which it publishes on its web site as Part II of its Member Principles under the heading, "Marketing."[40] Thus, these ethical principles are still current and applicable.

**AMA Statement of Ethics**

88. The American Marketing Association ("AMA") "commits itself to promoting the highest standard of professional ethical norms and values ..." Exhibit B.[41] As such, it has published its "Statement of Ethics." *Id.* AMA states that "marketers are expected to embrace the highest professional ethical norms and the ethical values implied by our responsibility toward multiple stakeholders (e.g., customers ...)." *Id.* Thus, the Statement of Ethics contains "Ethical Norms," which "are established standards of conduct that are expected and maintained by society and/or professional organizations." *Id.*

89. The AMA's Ethical Norms state that marketers must "consciously avoid[] harmful actions and omissions," "striv[e] for good faith and fair dealing," "avoid[] deception in ... pricing, communication, and delivery of distribution," and affirm "core values" of honesty, ... fairness [and] transparency."

90. By misrepresenting that the Class Products can repair gums, Defendant violated these Ethical Norms because, among other reasons, it did not strive (or achieve) good faith and fair dealing, did not avoid deception in pricing, communication and delivery of distribution, and did not affirm the core values of honesty, fairness and transparency.

[39] https://www.ana.net/content/show/id/49074 (accessed 1/21/2021).
[40] https://thedma.org/accountability/ethics-and-compliance/dma-ethical-guidelines/ (accessed 1/21/2021).
[41] https://www.ama.org/codes-of-conduct/ (accessed 1/21/2021).

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

91. The AMA has also published "Ethical Values," which "represent the collective conception of what communities find desirable, important and morally proper." *Id.* AMA states that marketers' Ethical Values include honesty, meaning "[s]triv[ing] to be truthful in all situations and at all times" and "[h]onoring our explicit and implicit commitments and promises."

92. Another Ethical Value, according to the AMA, is fairness, which includes "[r]epresent[ing] products in a clear way in selling, advertising and other forms of communication," "avoid[ing] false, misleading and deceptive promotion," and "[r]efusing to engage in 'bait-and-switch' tactics." *Id.*

93. Yet another Ethical Value, according to the AMA, is "Transparency," which includes "[s]triv[ing] to communicate clearly with all constituencies." *Id.*

94. By misrepresenting that the Class Products can repair gums, Defendant violated these Ethical Values, because, among other reasons, it was not truthful (to say nothing of not striving to be truthful) in all situations, did not honor its explicit and implicit commitments and promises, did not represent its products in a clear way, did not avoid false, misleading and deceptive promotion, and did not communicate clearly.

**CLASS ALLEGATIONS**

95. Plaintiff brings this action on behalf of herself and as a representative of all others who are similarly situated. Plaintiff seeks certification of the following class:

> All persons in the state of Missouri who purchased one or more of the Class Products in Missouri during the Class Period.
>
> ("Class").
>
> All Class Members who purchased one or more of the Class Products for personal, family, or household purposes.
>
> ("MMPA Subclass").

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

96. Excluded from the Class are any employee of P&G, as well as the officers, directors, affiliates, legal representatives, predecessors, successors, and assigns of P&G. Also excluded are the judges and court personnel in this case and any members of their immediate families.

97. Plaintiff reserves the right to amend or modify the Class definitions with greater specificity or division into subclasses after having had an opportunity to conduct discovery.

98. The Class Period is that period within the statute of limitations for this action and extending until a Class is certified herein.

99. This action is properly maintainable as a class action under Missouri Supreme Court Rule 52.08.

100. **Numerosity.** The members of the Class are so numerous that joinder of all members is impractical. In oral care, P&G has the "number two market share position with nearly 20% global market share behind [its] Oral-B and Crest brands."[42]

101. **Commonality and Predominance.** There are questions of law and fact common to the Class that predominate over any questions affecting individual members of the Class. These common questions include, without limitation:

a. Whether the representation of "Gum & Enamel Repair" on the Class Products was false or misleading;

b. Whether the representation of "Gum & Enamel Repair" on the Class Products was material;

[42] P&G 2019 Annual Report, p. 13, *available at* https://www.annualreports.com/HostedData/AnnualReports/PDF/NYSE_PG_2019.pdf (last visited Jan. 22, 2021).

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

c. Whether the representation of "Gum & Enamel Repair" on the Class Products constitutes the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact;

d. Whether P&G has been unjustly enriched by its retention of profits from the sale of the misleading Class Products that it advertised, marketed, and sold;

e. Whether Plaintiff and the members of the Class are entitled to an award of compensatory damages and/or restitution and/or disgorgement; and

f. Whether injunctive, declaratory, and/or or other equitable relief is warranted pursuant to the MMPA.

102. **Adequacy.** Plaintiff is a member of the Class she seeks to represent, is committed to the vigorous prosecution of this action, and has retained competent counsel experienced in the prosecution of class actions. Accordingly, Plaintiff is an adequate representative and will fairly and adequately protect the interests of the Class.

103. **Typicality.** Plaintiff's claims are typical of the claims of the Class Members. Plaintiff and all Class Members have been damaged by Defendant's misrepresentations described herein.

104. **Superiority.** A class action is superior to all other available methods for the fair and efficient adjudication of the controversy. Because the amount of each individual Class member's claim is small relative to the complexity of the litigation, and due to the financial resources of P&G, no Class member could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, Class members will continue to suffer losses and P&G's misconduct will proceed without remedy. Even if Class members themselves could

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

afford such individual litigation, the court system could not. Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows claims to be heard that might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive supervision by a single court. Finally, Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

105. **Class Action on Limited Issues.** Because there are common individual issues among the Class, it is appropriate for this action to be maintained as a class action with respect to particular issues if necessary. *See* Mo. Sup. Ct. R. 52.08(c)(4).

**COUNT I: Violation of the MMPA By Means of Unfair Practices**
**(Plaintiff and the MMPA Subclass)**

106. Plaintiff hereby incorporates and adopts by reference each and every allegation set forth above.

107. The actions of Defendant alleged herein violated, and continue to violate, the Missouri Merchandising Practices Act ("MMPA"), Mo. Rev. Stat. § 407.010 *et seq*, because they constitute unfair practices.

108. The MMPA, Mo. Rev. Stat. § 407.020, states in relevant part:

> The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce . . . is declared to be an unlawful practice.

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

109. Plaintiff, on behalf of herself and all others similarly situated in Missouri, is entitled to bring this action pursuant to Mo. Rev. Stat. § 407.025, which provides in relevant part that:

> 1. Any person who purchases or leases merchandise primarily for personal, family or household purposes and thereby suffers an ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of a method, act or practice declared unlawful by section 407.020, may bring a private civil action in either the circuit court of the county in which the seller or lessor resides or in which the transaction complained of took place, to recover actual damages. The court may, in its discretion, award punitive damages and may award to the prevailing party attorney's fees, based on the amount of time reasonably expended, and may provide such equitable relief as it deems necessary or proper.
>
> 2. Persons entitled to bring an action pursuant to subsection 1 of this section may, if the unlawful method, act or practice has caused similar injury to numerous other persons, institute an action as representative or representatives of a class against one or more defendants as representatives of a class . . . . In any action brought pursuant to this section, the court may in its discretion order, in addition to damages, injunction or other equitable relief and reasonable attorney's fees.

110. The MMPA defines "merchandise" as any objects, wares, goods, commodities, intangibles, real estate or services. Mo. Rev. Stat. § 407.010. Thus, the Class Products that Defendant sells constitutes merchandise.

111. In selling the Class Products to consumers, Defendant is engaging in the sale of merchandise in trade or commerce.

112. Plaintiff and the MMPA Subclass purchased Class Products for personal, family, or household purposes and received Class Products that did not have the characteristics, uses, and/or benefits that Defendant represented.

113. The Missouri Attorney General has promulgated a regulation defining the meaning of unfair practices as used in the MMPA. That definition states that unethical practices are unfair in violation of the above statute. Mo. Code Regs. tit. 15, § 60-8.020.

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

114. Missouri case law provides that the MMPA's "literal words cover *every practice imaginable and every unfairness to whatever degree*." *Conway v. CitiMortgage, Inc.*, 438 S.W.3d 410, 416 (Mo. 2014) (quoting *Ports Petroleum Co., Inc. of Ohio v. Nixon*, 37 S.W.3d 237, 240 (Mo. banc 2001). Furthermore, the statute's "plain and ordinary meaning of the words themselves ... are unrestricted, all-encompassing and exceedingly broad." *Id.* at 240.

115. Pursuant to the MMPA, Defendant has a duty not to engage in any unfair practice in connection with the sale of any merchandise in trade or commerce. For the reasons stated herein, it breached that duty.

116. Falsely representing that the Class Products can repair gums is unfair and unethical and violates generally accepted principles of ethical business conduct, including the principles of the Direct Marketing Association and the American Marketing Association, as set forth above.

117. Plaintiff and the MMPA Subclass thereby suffered ascertainable loss in that they overpaid for the Class Products because they paid a price that was based on Defendant's material false or misleading statements regarding the ability of the Class Products to repair gums, in an amount to be proved at trial.

118. Defendant's acts and practices alleged herein have directly, foreseeably, and proximately caused loss, damages, and injury to Plaintiff and the MMPA Subclass in an amount to be determined at trial.

119. WHEREFORE, Plaintiff and the MMPA Subclass pray for the relief requested in the Prayer for Relief set forth below in this Petition.

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

**COUNT II: Violation of the MMPA By Means of Deception**
**(Plaintiff and the MMPA Subclass)**

120. Plaintiff hereby incorporates and adopts by reference each and every allegation set forth above.

121. The actions of Defendant alleged herein violated, and continue to violate, the MMPA because they constitute deception.

122. Mo. Rev. Stat. § 407.020.1 prohibits "[t]he act, use or employment by any person of any … deception … in connection with the sale or advertisement of any merchandise in trade or commerce."

123. The Missouri Attorney General has promulgated a regulation defining the meaning of deception as used in the MMPA. That definition states that deception is any "method, act, use, practice, advertisement or solicitation that has the tendency or capacity to mislead, deceive or cheat, or that tends to create a false impression." Mo. Code Regs. Ann. tit. 15, § 60-9.020.

124. Pursuant to the MMPA, Defendant has a duty not to engage in any deception in connection with the sale or advertisement of any merchandise in trade or commerce. For the reasons stated herein, it breached that duty.

125. Defendant misrepresenting that the Class Products can repair gums constitutes deception under the MMPA, because this act or practice has the tendency or capacity to mislead, deceive, cheat, and/or create a false impression. Such practice misleads and deceives consumers into believing that the Class Products can repair gums, when in reality that is not true.

126. Plaintiff and the MMPA Subclass suffered ascertainable loss in that they overpaid for the Class Products because they paid a price that was based on Defendant's material false or

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

misleading statements regarding the ability of the Class Products to repair gums, in an amount to be proved at trial.

127. Defendant's deceptive acts and practices have directly, foreseeably, and proximately caused loss, damages and injury to Plaintiff and the MMPA Subclass.

128. WHEREFORE, Plaintiff and the MMPA Subclass pray for the relief requested in the Prayer for Relief set forth below in this Petition.

**COUNT III: Violation of the MMPA By Means of Omission of a Material Fact**
**(Plaintiff and the MMPA Subclass)**

129. Plaintiff hereby incorporates and adopts by reference each and every allegation set forth above.

130. The actions of Defendant alleged herein violated, and continue to violate, the MMPA because they constitute omission of a material fact.

131. Mo. Rev. Stat. § 407.020.1 prohibits "[t]he act, use or employment by any person of any … omission of a material fact … in connection with the sale or advertisement of any merchandise in trade or commerce."

132. The Missouri Attorney General has promulgated a regulation stating: "It is a misrepresentation for any person in connection with the advertisement or sale of merchandise to omit to state a material fact necessary in order to make statements made, in light of the circumstances under which they are made, not misleading." Mo. Code Regs. Ann. tit. 15, § 60-9.090.

133. A material fact is "any fact which a reasonable consumer would likely consider to be important in making a purchasing decision, or which would be likely to induce a person to manifest his/her assent, or which the seller knows would be likely to induce a particular

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

consumer to manifest his/her assent, or which would be likely to induce a reasonable consumer to act, respond or change his/her behavior in any substantial manner." 15 C.S.R. § 60-9.010.

134. Pursuant to the MMPA, Defendant has a duty not to omit material facts in connection with the sale or advertisement of any merchandise in trade or commerce. For the reasons stated herein, it breached that duty.

135. By labeling the Class Products "Gum & Enamel Repair" and omitting that the Class Products cannot actually repair damaged gums, Defendant has omitted material facts necessary to make the label of the Class Products not misleading.

136. Omitting that the Class Products cannot actually repair damaged gums is material because a reasonable consumer would likely consider this important to know when making a purchasing decision or this information would likely induce a reasonable consumer to change his or her decision to purchase the Class Products.

137. Plaintiff and the MMPA Subclass suffered ascertainable loss in that they overpaid for the Class Products because they paid a price that was based on Defendant's omission of a material fact regarding the ability of the Class Products to repair gums, in an amount to be proved at trial.

138. Defendant's omissions have directly, foreseeably, and proximately caused loss, damages and injury to Plaintiff and the MMPA Subclass.

139. WHEREFORE, Plaintiff and the MMPA Subclass pray for the relief requested in the Prayer for Relief set forth below in this Petition.

**COUNT IV: Unjust Enrichment**

140. Plaintiff hereby incorporates and adopts by reference the allegations contained in paragraphs 1-94 of this Petition, and to the extent necessary, pleads this Count in the alternative.

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

141. Plaintiff and the Class members conferred a monetary benefit on Defendant when they paid for the Class Products.

142. As set forth above, Defendant knowingly made false and/or misleading statements of material facts and/or misrepresented and/or concealed material facts in connection with its marketing, advertising, and sales of the Class Products.

143. Defendant has retained Plaintiff's and the Class members' purchase price despite its knowing false and/or misleading statements and/or misrepresentations and/or concealments on the Class Products' labels.

144. As a result, Defendant is unjustly enriched at the expense of Plaintiff and the Class.

145. Under principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiff and the Class that Defendant gained through deceptive and fraudulent material false and/or misleading statements and/or misrepresentations and/or omissions in the marketing, advertising, and selling of the Class Products.

146. As a direct and proximate result of Defendant's conduct, Plaintiff and the Class members overpaid for the Class Products because they paid a price that was based on Defendant's material false and/or misleading statements and/or misrepresentations and/or omissions regarding the ability of the Class Products to repair gums.

147. Accordingly, Plaintiff and the Class seek full disgorgement and restitution of the amounts Defendant has retained as a result of the unlawful and/or wrongful conduct alleged herein, an amount which will be proved at trial.

WHEREFORE, Plaintiff and the Class pray for the relief requested in the Prayer for Relief set forth below.

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the Class, seeks the following relief:

A. certification of the Class as requested herein;

B. appointing Plaintiff as the Class Representative and Plaintiff's attorneys as Class Counsel;

C. awarding Plaintiff and the Class compensatory damages, in an amount to be proved at trial;

D. awarding Plaintiff and the Class injunctive relief as permitted by law or equity, including, but not limited to, enjoining Defendant from continuing the unlawful practices as set forth herein and ordering Defendant to engage in a corrective advertising campaign;

E. awarding attorneys' fees and costs; and

F. providing such further relief as may be just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all claims so triable.

Dated: March 26, 2021

Respectfully submitted,

**LAW OFFICE OF RICHARD S. CORNFELD, LLC**

By: */s/ Richard S. Cornfeld*

Richard S. Cornfeld, MO Bar #31046
Daniel S. Levy, MO Bar #66039
1010 Market Street, Suite 1645
St. Louis, MO 63101
P. 314-241-5799
F. 314-241-5788
rcornfeld@cornfeldlegal.com
dlevy@cornfeldlegal.com

And

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

Mark C. Goldenberg, MO Bar #43155
Thomas P. Rosenfeld MO Bar #35305
Kevin P. Green MO Bar #63497
GOLDENBERG HELLER & ANTOGNOLI, P.C.
2227 South State Route 157
Edwardsville, IL 62025
618-656-5150
mark@ghalaw.com
tom@ghalaw.com
kevin@ghalaw.com

***Attorneys for Plaintiff***

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

# Exhibit A

Case: 4:21-cv-00855-RWS Doc. #: 1-1 Filed: 07/14/21 Page: 38 of 92 PageID #: 46

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM



DMA

# Direct Marketing Association's

# GUIDELINES

# for Ethical Business Practice

2014

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

# DIRECT MARKETING ASSOCIATION GUIDELINES for Ethical Business Practice

The Direct Marketing Association's Guidelines for Ethical Business Practice are intended to provide individuals and organizations involved in direct marketing in all media with generally accepted principles of conduct. These guidelines reflect DMA's long-standing policy of high levels of ethics and the responsibility of the Association, its members, and all marketers to maintain consumer and community relationships that are based on fair and ethical principles. In addition to providing general guidance to the industry, the Guidelines for Ethical Business Practice are used by DMA's Committee on Ethical Business Practice, an industry peer review committee, as the standard to which direct marketing promotions that are the subject of complaint to DMA are compared.

These guidelines represent DMA's general philosophy that self-regulatory measures are preferable to governmental mandates. Self-regulatory actions are more readily adaptable to changing techniques and economic and social conditions. They encourage widespread use of sound business practices.

Because dishonest, misleading or offensive communications discredit all means of advertising and marketing, including direct marketing, observance of these guidelines by all concerned is expected. All persons involved in direct marketing should take reasonable steps to encourage other industry members to follow these guidelines as well.

DMA Guidelines provide the basis for DMA member compliance for ethical marketing practices and compliance primarily under U.S. laws. Global companies should be reviewing international rules in addition to U.S. rules. For compliance examples and specific best practices which may be over and above baseline guidelines, please refer to DMA's guidance and best practice documents, such as its "Do the Right Thing" guidance. The DMA also asks its members to review the Fair Information Practices and Principles (FIPPs.) Send questions to ethics@the-dma.org.

**January, 2014**



Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

# DMA Member Principles

DMA Member Principles are the underlying framework for the *Guidelines for Ethical Business Practice* as detailed herein, and for Guidelines that will be drafted in the future. These Principles apply to DMA members' relationships with current and prospective customers, donors, and members, and are the grounding for all DMA members, which includes those who market directly not only to consumers, but also to businesses, government agencies, and "SOHO" (small-office/home-office) entities. The Principles provide a general statement to the public of the expectations they can have when dealing with DMA members.

**A DMA Member:**

1. Is committed to customer satisfaction, good corporate citizenship, and responsible environmental, community and financial stewardship
2. Clearly, honestly, and accurately represents its products, services, terms and conditions
3. Delivers its products and services as represented
4. Communicates in a respectful and courteous manner
5. Responds to inquiries and complaints in a constructive, timely way
6. Maintains appropriate security policies and practices to safeguard information
7. Provides information on its policies about the transfer of personally identifiable information for marketing purposes
8. Honors requests not to have personally identifiable information transferred for marketing purposes
9. Honors requests not to receive future solicitations from its organization
10. Follows the spirit and letter of the law as well as DMA's *Guidelines for Ethical Business Practice*

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

## *Table of Contents*

Page

About the DMA Guidelines....2
DMA Member Principles....3

***The Terms of the Offer***

Honesty and Clarity of Offer - Article #1....7
Accuracy and Consistency - Article #2....7
Clarity of Representations - Article #3....7
Actual Conditions - Article #4....7
Disparagement - Article #5....7
Decency - Article #6....7
Photographs and Artwork - Article #7....7
Disclosure of Sponsor and Intent - Article #8....8
Accessibility - Article #9....8
Solicitation in the Guise of an Invoice or Governmental Notification - Article #10....8
Postage, Shipping, or Handling - Article #11....8

***Advance Consent/Negative Option Marketing***

Article #12....8

***Marketing to Children***

Marketing to Children - Article #13....12
Parental Responsibility and Choice - Article #14....13
Collection and Use of Information from or about Children - Article #15....13
Marketing Online to Children Under 13 Years of Age - Article #16....13

***Special Offers and Claims***

Use of the Word "Free" and Other Similar Representations - Article #17....15
Price Comparisons - Article #18....15
Guarantees - Article #19....15
Use of Test or Survey Data - Article #20....15
Testimonials and Endorsements - Article #21....16

***Sweepstakes***

Use of the Term "Sweepstakes" - Article #22....17
No Purchase Option - Article #23....17
Chances of Winning - Article #24....17
Prizes - Article #25....18
Premiums - Article #26....18
Disclosure of Rules - Article #27....18

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

***Fulfillment***


Unordered Merchandise or Service - Article #28 ........ 19
Product Availability and Shipment - Article #29 ........ 19
Dry Testing - Article #30 ........ 19


***Collection, Use, and Maintenance of Marketing Data***


Consumer Choice & the Collection, Use, and Transfer of Personally Identifiable Data - Article #31 ........ 20
Personal Data - Article #32 ........ 22
Health Information Privacy and Protection - Article #33 ........ 22
Promotion of Marketing Lists - Article #34 ........ 25
Marketing List Usage - Article #35 ........ 25
Responsibilities of Database Compilers – Article #36 ........ 25
Data Security - Article #37 ........ 26


***Digital Marketing***


Online Information & OBA - Article #38 ........ 28
Mobile Service Commercial Message Solicitations Delivered to a Wireless Device – Article #39 ........ 33
Commercial Solicitations Online - Article #40 ........ 33
Email Authentication – Article #41 ........ 35
Use of Software or Other Similar Technology Installed on a Computer or Similar Device – Article #42 ........ 35
Social Media & Online Referral Marketing - Article #43 ........ 36
Email Appending to Consumer Records - Article #44 ........ 38


***Telephone Marketing to Landline & Wireless Devices***


Reasonable Hours - Article #45 ........ 39
Taping of Conversations - Article #46 ........ 39
Restricted Contacts - Article #47 ........ 39
Caller-ID/Automatic Number Identification Requirements – Article #48 ........ 40
Use of Automated Dialing Equipment/Robocalls – Article #49 ........ 40
Use of Prerecorded Voice & Text Messaging - Article #50 ........ 42
Use of Telephone Facsimile Machines - Article #51 ........ 44
Promotions for Response by Toll-Free and Pay-Per-Call Numbers - Article #52 ........ 44
Disclosure and Tactics - Article #53 ........ 45


***Mobile Marketing***


Obtaining Consent to Contact a Mobile Device – Article #54 ........ 45
Providing Notice about Mobile Marketing Practices – Article #55 ........ 46
Mobile Opt-Out Requests – Article #56 ........ 46

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

Sponsorship or Affiliate Marketing – Article #57 .....46
Location-Based Mobile Marketing – Article #58 .....46
Mobile Subscription & Premium Rate Services – Article #59 .....47

***Fundraising***
Article #60 .....49

***Laws, Codes, and Regulations***
Article #61 .....50

***Other DMA Resources*** .....50

***About DMA's Department of Corporate & Social Responsibility*** .....51

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

# *The Terms of the Offer*

**HONESTY AND CLARITY OF OFFER**
***Article #1***
All offers should be clear, honest, and complete so that the consumer may know the exact nature of what is being offered, the price, the terms of payment (including all extra charges) and the commitment involved in the placing of an order. Before publication of an offer, marketers should be prepared to substantiate any claims or offers made. Advertisements or specific claims that are untrue, misleading, deceptive, or fraudulent should not be used.

**ACCURACY AND CONSISTENCY**
***Article #2***
Simple and consistent statements or representations of all the essential points of the offer should appear in the promotional material. The overall impression of an offer should not be contradicted by individual statements, representations, or disclaimers.

**CLARITY OF REPRESENTATIONS**
***Article #3***
Representations which, by their size, placement, duration, or other characteristics are unlikely to be noticed or are difficult to understand should not be used if they are material to the offer.

**ACTUAL CONDITIONS**
***Article #4***
All descriptions, promises, and claims of limitation should be in accordance with actual conditions, situations, and circumstances existing at the time of the promotion.

**DISPARAGEMENT**
***Article #5***
Disparagement of any person or group on grounds addressed by federal or state laws that prohibit discrimination is unacceptable.

**DECENCY**
***Article #6***
Solicitations should not be sent to consumers who have indicated to the marketer that they consider those solicitations to be vulgar, immoral, profane, pornographic, or offensive in any way and who do not want to receive them.

**PHOTOGRAPHS AND ART WORK**
***Article #7***
Photographs, illustrations, artwork, and the situations they describe should be accurate portrayals and current reproductions of the products, services, or other subjects they represent.

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

**DISCLOSURE OF SPONSOR AND INTENT**
***Article #8***
All marketing contacts should disclose the name of the sponsor and each purpose of the contact. No one should make offers or solicitations in the guise of one purpose when the intent is a different purpose regardless of the marketing channel used.

**ACCESSIBILITY**
***Article #9***
Every offer should clearly identify the marketer's name and street address or telephone number, or both, at which the individual may obtain service and exercise their marketing preferences. If an offer is made online, the marketer should provide its name, an Internet-based contact mechanism, and a street address. For email solicitations, marketers should comply with Article #40 (Commercial Solicitations Online). For mobile marketing solicitations, marketers should comply with Articles #54-56 to provide adequate notice to consumers to allow them to exercise their marketing preferences.

**SOLICITATION IN THE GUISE OF AN INVOICE OR GOVERNMENTAL NOTIFICATION**
***Article #10***
Offers that are likely to be mistaken for bills, invoices, or notices from public utilities or governmental agencies should not be used.

**POSTAGE, SHIPPING, OR HANDLING CHARGES**
***Article #11***
Postage, shipping, or handling charges, if any, should bear a reasonable relationship to actual costs incurred.

**ADVANCE CONSENT/NEGATIVE OPTION MARKETING**
***Article #12***
These guidelines apply to all media and address marketing plans where the consumer gives consent to receive and pay for goods or services in the future *on a continuing or periodic basis, unless and until the consumer cancels the plan.*

The following should apply to all advance consent or negative option marketing plans:

1. Initial Offer:

   CONSENT: Regardless of channel, marketers should have the consumer's express informed consent to participate in any advance consent or negative option marketing plan before the consumer is billed or charged. For example, a pre-checked box without further action, such as clicking a response button or sending back a response to confirm individual consent is not sufficient. In telephone sales where the consumer agrees to the offer in a way other than by credit or debit card payment, the consumer consent must be written or audio recorded.

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

- Marketers should inform consumers in the initial offer of their right to cancel their participation in the plan and any outstanding fees that may be owed.

- Marketers should inform consumers in the initial offer of the length of any trial period, including a statement that the consumer's account will be charged after the trial period (including the date of the charge) unless the consumer takes an affirmative step to cancel, providing the consumer a reasonable time period to cancel, and the steps needed to avoid charges.

**MATERIAL TERMS & CONDITIONS:** Regardless of channel, marketers should clearly and conspicuously disclose all material terms and conditions before obtaining the consumer's billing information, including:

- A description of the goods or services being offered
- The identity of the marketer and contact information for service or cancellation
- The interval between shipments or services to be provided
- The price or the range of prices of the goods or services purchased by the consumer, including whether there are any additional charges should be disclosed
- Whether the consumer will be billed or automatically charged
- When and how frequently the consumer will be billed or charged
- Any terms with regards to a "free to keep" incentive as applicable
- The fact that the consumer must take affirmative action to cancel in order to avoid future billing or charges
- The specific and easy steps that consumers should follow to cancel the plan and to stop recurring charges from being placed on the consumer's account, and
- The time period within which the consumer must cancel.

When applicable, the following terms and conditions should also be clearly and conspicuously disclosed in the initial offer:

- That the current plan or renewal prices of the goods or services are subject to change
- The length of any free, trial or approval period in time or quantity
- The length of membership period, and the length of subsequent renewal or billing periods
- The fact that goods or services will continue after the free period unless the consumer cancels
- Any minimum purchase obligations, and
- The terms and conditions of any refund policy

In instances where the marketer uses pre-acquired account information under a free-to-pay conversion plan, the marketer should:

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

- Obtain from the consumer the complete account number to be charged within the appropriate data security protocols (such as PCI compliance)
- Obtain affirmative consent from the consumer to charge such account, and
- Provide channel specific proof (an email or hard copy confirmation, or if via telephone, audio record the entire transaction.)

In instances where the marketer uses pre-acquired account information but does not engage in a free-to-pay conversion plan, the marketer should:

- Identify with specificity the account that will be charged, and
- Obtain affirmative consent from the consumer to charge such account

2. Providing the Goods & Services to the Consumer:

- Marketers may provide products or services and bills concurrently; however, consumers should not be obligated to pay bills prior to the expiration of any trial period.

- Marketers should inform consumers in renewal reminders of their right to cancel their participation in the plan, and any outstanding fees owed.

- Marketers should provide renewal reminders at the frequency specified in the initial offer.

3. Cancellation:

- Marketers should promptly honor requests for refunds due upon consumers' cancellation of the plan.

- Marketers should allow consumers a reasonable length of time between receipt of renewal reminders and the renewal date, after which consumers can cancel the plan.

- Marketers should honor the time period they provided for a cancellation and should honor a cancellation after the expiration of the trial period.

4. For Internet Sales:

The initial merchant must never disclose a credit card, debit card or other financial account number or other billing information that is used to charge the customer of the initial merchant to any post-transaction third party seller for use in an Internet-based sale of any goods or services from that post-transaction third party seller.

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

Post-Transaction Third Party Sales:

For post-transaction third party sellers:
No charges should apply to a consumer's account before obtaining the consumer's billing information as follows:

The third party seller has first clearly and conspicuously disclosed to the purchaser a description of the goods and services being offered and all material terms of the offer including:

- The fact that the third party seller is not affiliated with the initial merchant;
- The costs of such goods or services;
- And the consumer has provided express informed consent for the charges by providing the complete account information to be charged, providing the consumer's name and address and a means to contact the consumer, and providing confirmation such as clicking a confirmation button or otherwise demonstrating consent to the charges.

All marketing partners or service providers should comply with these guidelines.

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

# *Marketing to Children*

**MARKETING TO CHILDREN**
***Article #13***
Offers and the manner in which they are presented that are suitable for adults only should not be made to children. In determining the suitability of a communication with children online, via wireless devices such as a mobile phone, or in any other medium, or by providing a commercial website or other online services directed to children under 13, marketers should first determine whether the collection and use of the child's data for marketing purposes or the sending of marketing material to the child is permitted under federal law, such as the Children's Online Privacy Protection Act (COPPA), or state law. Where marketing to children is permitted by law, marketers should ensure the marketing is suitable for the child taking into account the age range, knowledge, sophistication, and maturity of their intended audience.

**Definitions:**

**Covered Entities for COPPA and related online data issues:** These include operators of commercial websites and online services (including mobile apps or any service available over the Internet or that connects to the Internet or a wide-area network) directed to children under 13 that collect, use or disclose personal information from children; third parties (e.g. social plug ins and ad networks) with actual knowledge of such information collection. Further, first parties are held strictly accountable for the actions of third parties on that first party's site or service.

**Personal Information:**
This includes the following:

First and last name;
A home or other physical address;
Online contact information;
A screen or user name that functions as online contact information;
A telephone number;
A social security number;
A persistent identifier that serves to recognize a user over time across different websites or online services;
A video, photograph or audio file where such file contains a child's image or voice;
Geolocation information sufficient to identify street name and name of a city or town; or
Information concerning the child or the parents of the child that the operator collects online from the child and combines with an identifier described above.

**Direct Notice to Parents:** Parents must be provided with a detailed direct notice of the operator's personal information collection, use and disclosure practices, not through a hyperlink.

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

**PARENTAL RESPONSIBILITY AND CHOICE**
***Article #14***
Marketers communicating commercial appeals, operators of commercial websites, and online services (such as mobile apps) directed to children under 13 should provide direct notice (as defined above) and an opportunity to opt out of the marketing process so that parents have the ability to limit the collection, use, and disclosure of their children's names, addresses, or other personally identifiable information prior to such collection, use and disclosure.

Parents must be provided the choice of consenting to the operator's collection and internal use of a child's information. Such information may never be disclosed to third parties (unless the disclosure is integral to the site or service, in which case that must be made clear to the parent.)

Parents must have access to their child's personal information to review and/or have that information deleted.

Parents must be given an opportunity to prevent further use or online collection of a child's personal information.

**COLLECTION AND USE OF INFORMATION FROM OR ABOUT CHILDREN**
***Article #15***
Marketers should limit the collection, use, and dissemination of personally identifiable information collected from or about children to that information that is required for the promotion, sale, and delivery of goods and services; the provision of customer services; conducting market research; and engaging in other appropriate marketing activities.

Marketers should effectively explain that the information is being requested for marketing purposes. Information not appropriate for marketing purposes should not be collected.

Upon request from a parent, marketers should promptly provide the source and general nature of information maintained about a child and allow for removal or correction.

Marketers should implement the strictest security measures to ensure against unauthorized access, alteration, or dissemination of the data collected from or about children, and should provide information regarding such measures upon request to the parent or guardian of the minor.

Operators should retain personally identifiable information only as long as is reasonably necessary, and must delete personally identifiable information using reasonable measures.

**ONLINE MARKETING TO CHILDREN UNDER 13 YEARS OF AGE**
***Article #16***

This Article applies to online marketing as follows:

Online marketers (operators of general audience websites or online services) should not knowingly collect personally identifiable information online or via wireless handsets or devices

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

from a child under 13 without prior verifiable parental consent and direct parental notification of the nature and intended use of such information, and shall provide an opportunity for the parent to prevent such use and participation in the activity.

Operators of websites and online services must provide a privacy notice with clear and concise description of their information policies and practices. This notice should be easy to read on smaller screens (e.g., mobile devices.) for parents and allow them to provide verifiable consent.

Marketers are not required to ask the age of a child and may rely on the information provided by the user. Marketers may age screen users and apply notice and consent requirements only for users that identify themselves as being under age 13. If an operator later determines that a particular user is a child under the age of 13, parental notice and consent requirements are triggered.

Online and wireless/mobile contact information should only be used to directly respond to an activity initiated by a child and not to re-contact a child for other purposes without verifiable prior parental consent.

Marketers should not knowingly collect, without verifiable prior parental consent, personally identifiable information online or via a wireless handset or device from children that would permit any offline contact with the child.

Marketers should not knowingly distribute to any third parties, without verifiable prior parental consent, information collected from a child that would permit any contact with that child.

Marketers should take reasonable steps to prevent the online publication or posting of information that would allow a third party to contact a child offline unless the marketer has verifiable prior parental consent.

Marketers should not entice a child online to divulge personally identifiable information by the prospect of a special game, prize, or other offer.

Marketers should not make a child's access to website or mobile content contingent on the collection of personally identifiable information. Only online contact information used to enhance the interactivity of the site is permitted.

The following assumptions underlie these online guidelines:

- When a marketer directs a site at a certain age group, it can expect that the visitors to that site are in that age range, and
- When a marketer asks the age of the child, the marketer can assume the answer to be truthful.

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

# *Special Offers and Claims*

**USE OF THE WORD "FREE" AND OTHER SIMILAR REPRESENTATIONS**
***Article #17***
A product or service that is offered without cost or obligation to the recipient may be unqualifiedly described as "free."

If a product or service is offered as "free," all qualifications and conditions should be clearly and conspicuously disclosed, in close conjunction with the use of the term "free" or other similar phrase. When the term "free" or other similar representations are made (for example, 2-for-1, half-price, or 1-cent offers), the product or service required to be purchased should not have been increased in price or decreased in quality or quantity.

**PRICE COMPARISONS**
***Article #18***
Price comparisons, including those between a marketer's current price and a former, future, or suggested price, or between a marketer's price and the price of a competitor's comparable product, should be fair and accurate.

In each case of comparison to a former, manufacturer's suggested, or competitor's comparable product price, recent substantial sales should have been made at that price in the same trade area.

For comparisons with a future price, there should be a reasonable expectation that the new price will be charged in the foreseeable future.

**GUARANTEES**
***Article #19***
If a product or service is offered with a guarantee or a warranty, either the terms and conditions should be set forth in full in the promotion, or the promotion should state how the consumer may obtain a copy. The guarantee should clearly state the name and address of the guarantor and the duration of the guarantee.

Any requests for repair, replacement, or refund under the terms of a guarantee or warranty should be honored promptly. In an unqualified offer of refund, repair, or replacement, the customer's preference should prevail.

**USE OF TEST OR SURVEY DATA**
***Article #20***
All test or survey data referred to in advertising should be valid and reliable as to source and methodology, and should support the specific claim for which it is cited. Advertising claims should not distort test or survey results or take them out of context.

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

**TESTIMONIALS AND ENDORSEMENTS**
***Article #21***
Testimonials and endorsements in any media (including but not limited to such comments on a company's website and via social networking sites, online message boards, blogging and "word-of-mouth" marketing) should be used only if they:

a. Are authorized by the person quoted;
b. Are accurate, genuine and related to the experience of the person giving them, both at the time made and at the time of the promotion, and disclose the expertise of the endorser in terms of whether he or she is an expert for the purposes of the advertisement or simply a consumer endorser;
c. Are not taken out of context so as to distort the endorser's opinion or experience with the product or service;
d. Clearly and conspicuously disclose any material connections between the endorser and marketer, which the consumer would not expect. A material connection refers to a connection between the endorser and marketer that materially affects the weight or credibility of the endorsement, such as payments or free products, or an employer/employee relationship; and
e. Clearly and conspicuously disclose the generally expected, or typical, results/performance of the advertised products or services, if the claims made are not typical of what a user could expect under normal circumstances.

A marketer should be able to provide prior and adequate substantiation, including providing reliable scientific evidence, as necessary, for any claims of efficacy (i.e. whether the product/service will actually do what the marketer says it will do, typicality (i.e. whether the typical consumer will have an experience like that of the endorser), and environmental benefit. The marketer should also be able to substantiate that the endorser was a bona fide user of the product at the time of the endorsement.

Additionally, marketers should ensure that their celebrity endorsers disclose their relationships with marketers when making endorsements outside the context of traditional advertisements, such as on talk shows or in social media, and they should not knowingly make statements that are false or unsubstantiated.

For purposes of this article, the terms "testimonial" and "endorsement" refer to an advertising or marketing message made in any channel that consumers are likely to believe reflects the opinions, beliefs, findings, or experiences of a party other than the sponsor of the message, even if the views expressed by that party are identical to those of the sponsor. Testimonials and endorsements can be verbal statements, demonstrations, or depictions of the name, signature, likeness or other identifying personal characteristics of an individual or the name or seal of an organization.

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

# *Sweepstakes*

**USE OF THE TERM "SWEEPSTAKES"**
***Article #22***
Sweepstakes are promotional devices by which items of value (prizes) are awarded to participants by chance without the promoter's requiring the participants to render something of value (consideration) to be eligible to participate. The co-existence of all three elements -- prize, chance and consideration -- in the same promotion constitutes a lottery. It is illegal for any private enterprise to run a lottery without specific governmental authorization.

When skill replaces chance, the promotion becomes a skill contest. When gifts (premiums or other items of value) are given to all participants independent of the element of chance, the promotion is not a sweepstakes. Promotions that are not sweepstakes should not be held out as such.

Only those promotional devices that satisfy the definition stated above should be called or held out to be a sweepstakes.

**NO PURCHASE OPTION**
***Article #23***
Promotions should clearly state that no purchase is required to win sweepstakes prizes. They should not represent that those who make a purchase or otherwise render consideration with their entry will have a better chance of winning or will be eligible to win more or larger prizes than those who do not make a purchase or otherwise render consideration. The method for entering without ordering should be easy to find, read, and understand. When response devices used only for entering the sweepstakes are provided, they should be as easy to find as those utilized for ordering the product or service.

**CHANCES OF WINNING**
***Article #24***
No sweepstakes promotion, or any of its parts, should represent that a recipient or entrant has won a prize or that any entry stands a greater chance of winning a prize than any other entry when this is not the case. Winners should be selected in a manner that ensures fair application of the laws of chance.

**PRIZES**
***Article #25***
Sweepstakes prizes should be advertised in a manner that is clear, honest, and complete so that the consumer may know the exact nature of what is being offered. For prizes paid over time, the annual payment schedule and number of years should be clearly disclosed.

Photographs, illustrations, artwork, and the situations they represent should be accurate portrayals of the prizes listed in the promotion.

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

No award or prize should be held forth directly or by implication as having substantial monetary value if it is of nominal worth. The value of a non-cash prize should be stated at regular retail value, whether actual cost to the sponsor is greater or less.

All prizes should be awarded and delivered without cost to the participant. If there are certain conditions under which a prize or prizes will not be awarded, that fact should be disclosed in a manner that is easy to find, read, and understand.

**PREMIUMS**
***Article #26***
Premiums should be advertised in a manner that is clear, honest, and complete so that the consumer may know the exact nature of what is being offered.

A premium, gift or item should not be called or held out to be a "prize" if it is offered to every recipient of or participant in a promotion. If all participants will receive a premium, gift, or item, that fact should be clearly disclosed.

**DISCLOSURE OF RULES**
***Article #27***
All terms and conditions of the sweepstakes, including entry procedures and rules, should be easy to find, read, and understand. Disclosures set out in the rules section concerning no purchase option, prizes, and chances of winning should not contradict the overall impression created by the promotion.

The following should be set forth clearly in the rules:

- No purchase of the advertised product or service is required in order to win a prize
- A purchase will not improve the chances of winning
- Procedures for entry
- If applicable, disclosure that a facsimile of the entry blank or other alternate means (such as a 3"x 5" card) may be used to enter the sweepstakes
- The termination date for eligibility in the sweepstakes. The termination date should specify whether it is a date of mailing or receipt of entry deadline
- The number, retail value (of non-cash prizes), and complete description of all prizes offered, and whether cash may be awarded instead of merchandise. If a cash prize is to be awarded by installment payments, that fact should be clearly disclosed, along with the nature and timing of the payments
- The estimated odds of winning each prize. If the odds depend upon the number of entries, the stated odds should be based on an estimate of the number of entries
- The method by which winners will be selected
- The geographic area covered by the sweepstakes and those areas in which the offer is void
- All eligibility requirements, if any
- Approximate dates when winners will be selected and notified
- Publicity rights regarding the use of winner's name
- Taxes are the responsibility of the winner
- Provision of a mailing address to allow consumers to receive a list of winners of prizes over $25.00 in value

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

# *Fulfillment*

**UNORDERED MERCHANDISE OR SERVICE**
***Article #28***
Merchandise or services should not be provided without having first received the customer's permission. The exceptions are samples or gifts clearly marked as such, and merchandise mailed by a charitable organization soliciting contributions, as long as all items are sent with a clear and conspicuous statement informing the recipient of an unqualified right to treat the product as a gift and to do with it as the recipient sees fit, at no cost or obligation to the recipient.

**PRODUCT AVAILABILITY AND SHIPMENT**
***Article #29***
Direct marketers should offer merchandise only when it is on hand or when there is a reasonable expectation of its timely receipt.

Direct marketers should ship all orders according to the terms of the offer or within 30 days where there is no promised shipping date, unless otherwise directed by the consumer, and should promptly notify consumers of any delays.

**DRY TESTING**
***Article #30***
Direct marketers should engage in dry testing only when the special nature of the offer is made clear in the promotion.

# *Collection, Use, and Maintenance of Marketing Data*

For purposes of the *Guidelines for Ethical Business Practice*, the following definitions are used:

*Consumer* refers to the subject of the data.

*Marketing data* means actual or inferred information consistent with a person's commercial or charitable inquiry or transaction, or market research or market survey information. Such information can be derived from either a direct contact or marketing partnership when linked to a person's name, postal or email address, or telephone number, or any other personally identifiable information. When obtained from a publicly available source, information (including public record information), not combined with other information, is not marketing data.

*Marketing purpose* means any activity undertaken to collect, aggregate, analyze, maintain, update, or sell information in order to allow or induce consumers to take action to purchase, rent, or exchange products, property or services, to solicit a charitable donation, to utilize market research or market surveys, or to provide verification services to marketers.

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

**PROVIDING CONSUMER CHOICE & THE COLLECTION, USE, AND TRANSFER OF PERSONALLY IDENTIFIABLE DATA**

***Article #31***
This article is applicable to all addressable media and applies to senders of marketing offers or fundraising solicitations:

**A. Providing Consumer Choice and Privacy Notice Information:**

- Marketers should provide consumers a point of contact where they may add, modify or eliminate direct marketing communications from a company or an organization and obtain the company or organization's privacy policy with regards to collection, use and transfer of their information. The point of contact information (such as a website, telephone number or address) should appear upon or within each written marketing offer, or upon request by the consumer.

- Online marketers should provide notice in accordance with Article #38.

- Email marketers should provide notice in accordance with Article #39 and the CAN-SPAM Act.

- Mobile marketers must obtain prior express consent and provide a notice in accordance with Articles #54 and #55.)

- The point of contact notice should: be easy for the consumer to find, read, understand, and act upon.

- A marketer periodically should provide existing customers with notice of its policy concerning the rental, sale, exchange, or transfer of data about them and of the opportunity to opt out of the marketing process. All such opt-out requests should be honored promptly.

- An in-house suppression request from a consumer should be interpreted as meaning that the consumer also wants to opt out of the transfer of his or her personal information

- Upon request by a consumer, a marketer should disclose the source from which it obtained personally identifiable information about that consumer.

**B. Processing Consumer Choices:**

- A consumer's request for elimination of future marketing offers should be processed:
  - within 30 days of the consumer's request or as required by law, whichever is the shorter time period
  - for a period of at least three years from the date of receipt of the request

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

- Where an affiliate, division, or subsidiary markets under a different company or brand name, and is perceived as separate by the consumer, each corporate entity or brand should separately honor requests received by it.

- A marketer should establish internal policies and practices that assure accountability for honoring consumer preference requests regardless of the marketing channel, in compliance with this guideline, and at no cost to consumers. Should those policies substantially change, the marketer has an obligation to inform consumers of that change prior to the rental, sale, exchange, or transfer of data, and to offer consumers an opportunity to opt out of the marketing process at that time.

**C. DMAchoice and Related Consumer Choice Files:**

- For each prospecting list that is rented, sold, exchanged, or transferred, the names registered on the applicable DMAchoice (DMA's consumer choice web site) name-removal lists should be removed prior to use.

- DMAchoice name-removal lists include:

  - the relevant categorical opt-out mailing lists for Catalog, Magazine, Pre-screened Credit Offers or Other categories, as well as future categories designated by the DMA; and

  - the Email Preference Service and Telephone Preference Service, as well as future DMA preference service lists.

- The use of the DMAchoice name-removal lists and preference service lists is not required for the company's and organization's existing customer or donor lists, only for prospects.

- Members should be listed on the DMAchoice site to demonstrate their compliance with the DMA Guidelines and to provide a direct connection to consumers for further choice requests.

    - The company or organization listed must provide the correct point of contact where the consumer may exercise their marketing preferences. (*See Also* Article #9 Accessibility: Every offer should clearly identify the marketer's name and street address or telephone number, or both, at which the individual may obtain service and exercise their marketing preferences.)

In all instances, the most recent *monthly* release of the relevant DMAchoice file should be used.

In addition to adhering to these guidelines, a marketer should cooperate with DMA when requested in demonstrating its compliance with the Commitment to Consumer Choice and the marketer's own consumer preference policies.

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

**PERSONAL DATA**
***Article #32***
Marketers should be sensitive to the issue of consumer privacy and should only collect, combine, rent, sell, exchange, or use marketing data. Marketing data should be used only for marketing purposes.

Data and selection criteria that by reasonable standards may be considered sensitive and/or intimate should not be disclosed, be displayed, or provide the basis for lists made available for rental, sale or exchange when there is a reasonable expectation by the consumer that the information will be kept confidential.

Credit card numbers, checking account numbers, and debit account numbers are considered to be personal information and therefore should not be transferred, rented, sold, or exchanged when there is a reasonable expectation by the consumer that the information will be kept confidential. Because of the confidential nature of such personally identifying numbers, they should not be publicly displayed on direct marketing promotions or otherwise made public by direct marketers.

Social Security numbers are also considered to be personal information and therefore should not be transferred, rented, sold, or exchanged for use by a third party when there is a reasonable expectation by the consumer that the information will be kept confidential. Because of the confidential nature of Social Security numbers, they should not be publicly displayed on direct marketing promotions or otherwise made public by direct marketers. Social Security numbers, however, are used by direct marketers as part of the process of extending credit to consumers or for matching or verification purposes.

**HEALTH INFORMATION PRIVACY & PROTECTION**
***Article #33***

Nothing in these guidelines is meant to prohibit research, marketing, or other uses of health-related data which are not personally identifiable, and which are used in the aggregate since there are no restrictions on the use of de-identified health information.

**Health Information Data Protection:**

**Protected Health Information:**
Protected health information is individually identifiable information held or transmitted by a covered entity (a health plan, or a health care clearinghouse, or a health care provider) or its business associate in any form or media, whether written or oral. This information includes demographic information collected from an individual that can reasonably be used to identify the individual. Identifiers can include the individual's name, specific dates such as birth, admission, discharge, death, medical record number, photographs, city, zip code or geographic or other identifiers held as protected health data. Additionally, protected health information is information created or received by a health care provider, health plan, employer, or health care

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

clearinghouse; and relates to the past, present or future physical or mental health condition of the individual.

These principles apply to any individual or entity that collects, maintains, uses, and/or transfers such protected health information for marketing purposes, whether or not marketing is a primary purpose.

This includes business associates (including the subcontractors of the business associate) who perform functions or services for covered entities that involve the use of protected health information.

Such business associates may only use the protected health information if they have a written agreement to use such protected information for the covered entity's own marketing purposes.

**Principles:**

1. Protected health information gained in the context of a relationship between an individual and health or medical care providers or medical treatment facilities should not be transferred for marketing purposes without that individual's specific prior consent through a written signed authorization form. All marketing communications (receipt of financial remuneration in exchange for the communication) must have such prior written authorization and must include a statement that the organization will be paid for the marketing activity if the marketing includes direct or indirect payment from a third party.

   Exceptions:
   -Covered entities may provide offers for products and services in face-to-face encounters (this is to protect the doctor-patient relationship.)
   -Health and wellness communications may be provided by the covered entity about its own products and services.
   -General wellness and prevention communications may be provided.

2. Individually identifiable health-related information gained in the context of a relationship between individuals and health care providers or medical treatment facilities (as defined above) or other covered entities should not be used to contact those individuals for marketing purposes without the required prior written authorization.

3. Individually identifiable health-related information volunteered by individuals, and gathered outside of the relationship between individuals and covered entities, should be considered sensitive and personal in nature. Such information should not be collected, maintained, used, and/or transferred for marketing purposes unless those individuals receive, at the time the information is collected, a clear notice of the marketer's intended uses of the information, whether the marketer will transfer the information to third parties for further use, the name of the collecting organization, and the opportunity to opt out of transfer of the information. Such information includes, but is not limited to, information volunteered by individuals when responding to surveys and questionnaires. The notice should be easy to find, read, and understand.

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

4. Individually identifiable health-related information inferred about individuals, and gathered outside of the relationship between individuals and covered entities, should also be considered sensitive and personal in nature. This is information based on individual purchasing behavior. Such information includes, but is not limited to, data captured by inquiries, donations, purchases, frequent shopper programs, advertised toll-free telephone numbers, or other consumer response devices. Any entity, including a seller of over-the-counter drugs, which uses inferred health-related information should promptly provide the individual with notice and the opportunity to opt out of any transfer of the data for marketing purposes.

5. Marketers using individually identifiable health-related information should provide both the source and the nature of the information they have about that individual upon the request of that individual and the receipt of that individual's proper identification.

6. Individuals should not be required to release individually identifiable health-related information about themselves or to provide written authorizations to allow their health information be used for marketing purposes as a condition of receiving insurance coverage, treatment, services or information, or otherwise completing their health care-related transaction.

7. The text, appearance, and nature of solicitations directed to individuals on the basis of their health-related information should take into account the sensitive nature of such information.

8. Marketers should ensure that safeguards are built into their systems to protect individually identifiable health-related information from unauthorized access, alteration, abuse, theft, or misappropriation. Employees who have access to individually identifiable health-related information should agree in advance to use such information only in an authorized manner.

9. If individually identifiable health-related information is transferred from one direct marketer to another for a legitimate marketing purpose as established by written agreement, the transferor should arrange the most strict security measures to assure that unauthorized access to the information is not likely during the transfer process. Transfers of individually identifiable health-related information should not be permitted for any marketing uses that are in violation of any of DMA's *Guidelines for Ethical Business Practice*, state or federal laws.

10. **Fundraising exception for limited protected health information:** Entities are allowed to use or disclose to a business entity or institution or institutionally-related foundation limited protected health information (demographics and dates of care) about an individual for that entity's fundraising without a prior written authorization. However, the fundraising entity must ensure its fundraising material includes an opt-out notice that is clear and conspicuous, and if it is over the phone, an opt-out disclosure must be made. If the individual does opt-out, no more fundraising communications across all marketing channels may be made.

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

For the opt-out notice:

-the opt-out notice must be included in each fundraising communication;
-the opt-out method must be free;
-the entity cannot condition the treatment or services on an individual's choice to receive fundraising communication.

**PROMOTION OF MARKETING LISTS**

***Article #34***

Any advertising or promotion for marketing lists being offered for rental, sale, or exchange should reflect the fact that a marketing list is an aggregate collection of marketing data. Such promotions should also reflect a sensitivity for the consumers on those lists.

**MARKETING LIST USAGE**

***Article #35***

List owners, brokers, managers, and users of marketing lists should ascertain the nature of the list's intended usage for each materially different marketing use prior to rental, sale, exchange, transfer, or use of the list. List owners, brokers, and managers should not permit the rental, sale, exchange, or transfer of their marketing lists, nor should users use any marketing lists for an offer that is in violation of these guidelines. Mobile opt-in lists should not be rented or exchanged for the purpose of sending mobile marketing solicitations to those on the list, without obtaining prior express consent from those on the list.

**RESPONSIBILITIES OF DATABASE COMPILERS**

***Article #36***

For purposes of this guideline, a *database compiler* is a company that assembles personally identifiable information about consumers (with whom the compiler has no direct relationship) for the purpose of facilitating renting, selling, or exchanging the information to non-affiliated third party organizations for marketing purposes. *Customer* refers to those marketers that use the database compiler's data. *Consumer* refers to the subject of the data.

Database compilers should:

- Establish written (or electronic) agreements with customers that define the rights and responsibilities of the compiler and customer with respect to the use of marketing data.

- Upon a consumer's request, and within a reasonable time, suppress the consumer's information from the compiler's and/or the applicable customer's database made available to customers for prospecting.

- Not prohibit an end-user marketer from divulging the database compiler as the source of the marketer's information.

- At a minimum, explain to consumers, upon their request for source information, the nature and types of sources they use to compile marketing databases.

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

- Include language in their written (or electronic) agreements with DMA member customers that requires compliance with applicable laws and DMA guidelines. For non-DMA member customers they should require compliance with applicable laws and encourage compliance with DMA's guidelines. In both instances, customers should agree *before* using the marketing data.

- Require customers to state the purpose for which the data will be used.

- Use marketing data only for marketing purposes. If the data are non-marketing data but are used for marketing purposes, they should be treated as marketing data for purposes of this guideline.

- For sensitive marketing data, compilers should review materials to be used in promotions to help ensure that their customers' use of the data is both appropriate and in accordance with their stated purpose. Sensitive marketing data include data pertaining to children, older adults, health care or treatment, account numbers, or financial transactions.

- Randomly monitor, through seeding or other means, the use of their marketing databases to ensure that customers use them in accordance with their stated purpose.

- If a database compiler is or becomes aware that a customer is using consumer data in a way that violates the law and/or DMA's ethics guidelines, it should contact the customer and require compliance for any continued data usage, or refuse to sell the data and/or refer the matter to the DMA and/or a law enforcement agency.

**DATA SECURITY**
***Article #37***
The protection of personally identifiable information is the responsibility of all organizations. Therefore, organizations should assume the following responsibilities to provide secure transactions and to protect databases containing personally identifiable information against unauthorized access, alteration, or dissemination of data:

- Establish written data security policies and procedures reflective of current business practices (including written policies and procedures related to personal devices v. company-provided devices.) Organizations should ensure there are reasonable information security policies and practices that seek to assure the uninterrupted security of information systems within their organizations.

- Provide data security training for relevant staff. Organizations should create and implement reasonable staff procedures, training, and responsiveness measures to protect personally identifiable information handled by relevant staff in the everyday performance of their duties.

- Train staff that use their own devices on steps designed to help prevent unauthorized access to the organization's data as well as educate them about the inherent risks, and ensure the organization has reasonable data security policies and safeguards in place for such devices.

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

- Monitor and assess data security safeguards periodically. Organizations should employ and routinely assess protective physical safeguards and technological measures within their organizations, including data retention, destruction, deletion practices, and the monitoring and analysis of systems logs in support of information security.

- Include contractual safeguards. Organizations should contractually require all business partners and service providers that handle personally identifiable data to ensure that their policies, procedures, and practices maintain a level of security consistent with or higher than the organizations applicable information security policies, including partners' own employees and contractors accessing data through their own devices.

- Set up a data security breach readiness plan. Organizations should develop and maintain a data security breach readiness plan reasonable for the size and nature of the organization, their level of data collection, and type of data collected.

    - Include the following as reasonable within their organization:
        - Periodic audit of data retention. What is stored, on what servers, and who has access?
        - Employ appropriate data loss prevention technologies.
        - Employ an appropriate data minimization plan including a data destruction and purge process.
        - Maintain an inventory of system access and credentials.
        - Segment and isolate networks based on business function to avoid compromising sensitive personal information that is used in a network.
        - Create a reasonable incident response plan including vendor and law enforcement contacts as well as notification requirements.
        - Maintain a reasonable and ongoing employee training program.
        - Provide the appropriate one way encryption.
        - Maintain a reasonable password policy including minimum standards for passwords complexity and changes.

- If a data security breach occurs, immediately inform compliance or legal staff as identified in your data breach readiness plan. Organizations should, in the event of a security breach where there is a reasonable likelihood of material harm to consumers, inform those consumers who may be affected in the most expedient time practical (or as required by state laws) unless requested by legal authorities to delay such notification due to an ongoing criminal investigation.

- For email, organizations should implement the appropriate email authentication protocol (SPF, DKIM, DMARC as appropriate) to help reduce the risk of spoofed emails.

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

- Organizations collecting sensitive data must ensure added data security measures are taken to protect such data online. The appropriate digital certificate should be employed meaning the Extended Validation Secure Socket Layer Certificates (EV SSL) should be used on all relevant pages of sites requesting sensitive data.

# *Digital Marketing*

**ONLINE INFORMATION & ONLINE BEHAVIORAL ADVERTISING**
***Article #38***
This Article addresses the collection of personally identifiable information by websites for online marketing generally, and the collection and use of information for online behavioral advertising purposes, as defined in the Glossary of Terms.

**General Notice to Online Visitors**
If your organization operates an online site and/or is engaged in online behavioral advertising, you should make your information practices available to visitors in a prominent place on your website's home page or in a place on your website that is easily accessible from the home page.

In addition, if your organization offers a mobile application, you should make your information practices reasonably accessible to the consumers of your application.

This notice about information practices should be easy to find, read, and understand. Visitors should be able to comprehend the scope of the notice and how they can exercise their choices regarding use of personally identifiable information or information used for online behavioral advertising purposes. The notice should be available prior to or at the time personally identifiable information or information used for online behavioral advertising purposes is collected.

Your organization and its postal address, and the website(s) or mobile application(s) to which the notice applies, should be identified so visitors know who is responsible for the website or mobile application. You also should provide specific contact information so visitors can contact your organization for service or information.

If your organization collects personally identifiable information from visitors your notice should include:

- The nature of the information collected online for marketing purposes, and the types of uses you make of such information, including uses for online behavioral advertising purposes;
- The use(s) of such information, including whether you transfer information to third parties for use by them for their own marketing or online behavioral advertising purposes and the mechanism by which consumers can exercise choice not to have such information transferred;
- Whether personally identifiable information is collected by, used by, or transferred to agents (entities working on your behalf) as part of the business activities related to the

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

visitor's actions on the site or application, including to fulfill orders or to provide information or requested services;

- Whether you use cookies or other passive means of information collection, and whether such information collected is for internal purposes or transferred to third parties for marketing purposes, including online behavioral advertising purposes;
- What procedures your organization has put in place for accountability and enforcement purposes; and
- That your organization maintains appropriate physical, electronic, and administrative safeguards to protect information collected online and keeps your personal information secure.
- If your organization maintains a process for a consumer who uses or visits your website or mobile application to review and request changes to any of their personally identifiable information that is collected through the website or mobile application, you should describe that process.
- If the notice is for a mobile application, the notice should include applicable information under Article #55 and Article #58 below.
- The effective date of the notice should be provided.

If you knowingly permit network advertisers to collect information on their own behalf or on behalf of their clients on your Website or mobile application, you should also provide notice of fact that these types of entities collect information from your site or application and a link to a mechanism by which a visitor can exercise their choice of not having such information collected by these types of entities if they provide such choice. (Network advertisers are third parties that attempt to target online advertising and make it more relevant to visitors based on Web traffic information collected over time across the websites of others or application usage collected over time across applications offered by others.)

In addition, marketers should refer to Article #32 (Personal Data) specifically to assure that marketing data are used only for marketing purposes.

**Third-Party Notice for Online Behavioral Advertising**

When information is collected from or used on a website or mobile application for online behavioral advertising purposes, visitors should be provided with notice (easy to find, read and understand) about the third party's policies for online behavioral advertising. Third parties, as defined in the Glossary of Terms, should provide notice in one of the following ways:

- through a clear, meaningful, and prominent link described in or proximate to the advertisement delivered on the Web page or through the application where information is collected;
- on DMA's approved website(s), such as DMAchoice.org or another comprehensive industry-developed website(s), that is linked from the disclosure that describes the fact that information is being collected for online behavioral advertising purposes;
- on the web page where the information is collected if there is an arrangement with the website operator for the provision of such notice;
- if agreed to by the operator of the website(s) on its web page disclosing notice and choice regarding information collected for online behavioral advertising purposes.

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

**Consumer Choice for Third-Party Online Behavioral Advertising**
A third party should provide consumers with the ability to exercise choice with respect to the collection and use of information for online behavioral advertising purposes or the transfer of such information to a non-affiliate for such purposes. Such choice should be available through the notice options as detailed above.

**Material Changes to Existing Policies**
If your organization's policy changes materially with respect to the sharing of personally identifiable information with third parties including but not limited to changes for online behavioral advertising purposes, you should update your policy and give consumers conspicuous notice to that effect, offering an opportunity for individuals to select their preferences. Prior to making a materially different use of information collected from an individual for online behavioral advertising purposes, and before notice of your organization's policy change is given, organizations should obtain informed consent to such a new marketing use from the consumer.

**Honoring Choice**
You should honor a website visitor's choice regarding use and transfer of personally identifiable information made in accordance with your stated policy. If you have promised to honor the visitor's choice for a specific time period, and if that time period subsequently expires, then you should provide that visitor with a new notice and choice. You should provide choices online. You may also offer choice options by mail or telephone.

**Providing Access**
You should honor any representations made in your online policy notice regarding access.

**Information Security**
Your organization should maintain appropriate physical, technical and administrative safeguards and use appropriate security technologies and methods to protect information collected or used online, and to guard against unauthorized access, alteration, or dissemination of personally identifiable information during transfer and storage. Your procedures should require that employees and agents of your organization who have access to personally identifiable information use and disclose that information only in a lawful and authorized manner. Organizations should retain information that is collected and used for online behavioral advertising purposes only for as long as necessary to fulfill a legitimate business need, or as required by law.

**Visitors Under 13 Years of Age**
If your organization has a site or a mobile application directed to children under the age of 13 or collects personally identifiable information from visitors known to be under 13 years of age, your website should take the additional steps required by the *Marketing to Children* Articles of the *Guidelines for Ethical Business Practice* and inform visitors that your disclosures and practices are subject to compliance with the Children's Online Privacy Protection Act ("COPPA"). In addition, an organization should not engage in online behavioral advertising directed to children where it has actual knowledge that the children are under the age of 13, unless compliant with COPPA and these Guidelines.

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

**Health and Financial Information**
Entities should not collect and use financial account numbers, Social Security numbers, pharmaceutical prescriptions, or medical records about a specific individual for online behavioral advertising purposes without prior express consent and unless compliant with the Health Insurance Portability & Accountability Act ("HIPPA") health laws and regulations, financial rules and regulations, and these Guidelines.

**Accountability**
There should be a meaningful, timely, and effective procedure through which your organization can demonstrate adherence to your stated online information practices. Such a procedure may include: (1) self or third-party verification and monitoring, (2) complaint resolution, and (3) education and outreach. This can be accomplished by an independent auditor, public self-certification, a third-party privacy seal program, a licensing program, and/or membership in a trade, professional or other membership association with a self-regulatory program.

**Service Provider Treatment of Online Behavioral Advertising Information**
A service provider, as defined in the Glossary of Terms, should not collect and use information for online behavioral advertising purposes without consent and should provide an easy-to-use ongoing means to withdraw consent to the collection and use of that information for online behavioral advertising purposes.

In addition, a service provider should take the following steps regarding information collected and used for online behavioral advertising purposes:

1. Alter, anonymize, or randomize (e.g., through "hashing" or substantial redaction) any personally identifiable information or unique identifier in order to prevent the information from being reconstructed into its original form in the ordinary course of business.

2. Disclose in the notice described above the circumstances in which information is collected and used for online behavioral advertising purposes.

3. Take reasonable steps to protect the non-identifiable nature of information if and when it is distributed to non-affiliates, including not disclosing the algorithm or other mechanism used for anonymizing or randomizing the information, and obtaining satisfactory written assurance that such non-affiliates will not attempt to re-construct the information and will use or disclose the anonymized information only for purposes of online behavioral advertising or other uses as specified to users. This assurance will be considered satisfied if a non-affiliate does not have any independent right to use the information for its own purposes under a written contract.

4. Take reasonable steps to ensure that any non-affiliate that receives anonymized information will itself ensure that any other non-affiliate to which such information is disclosed agrees to the restrictions and conditions set forth in this subsection. This obligation is also considered satisfied if a non-affiliate does not have any independent right to use the data for its own purposes under a written contract.

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

**Glossary of Terms**

**Ad Delivery** -- means the delivery of online advertisements or advertising-related services using ad reporting data. Ad delivery does not include the collection and use of ad reporting data when such data are used to deliver advertisements to a computer or device based on the preferences or interests inferred from information collected over time and across non-affiliate sites because this type of collection and use is covered by the definition of online behavioral advertising.

**Ad Reporting** -- refers to the logging of page views on a website(s) or the collection or use of other information about a browser, operating system, domain name, clickstream within a site, date and time of the viewing of the Web page or advertisement, and related information for purposes including but not limited to: statistical reporting in connection with the activity on a website(s); Web analytics and analysis for improved marketing and better site design; and logging the number and type of advertisements served on a particular website(s).

**Affiliate** -- refers to an entity that controls, is controlled by, or is under common control with, another entity.

**Consent** -- means an individual's action in response to a clear, meaningful and prominent notice regarding the collection and use of data for online behavioral advertising purposes. Informed consent is based on information provided to an individual that allows them to select their preferences, prior express consent means consent required from an individual prior to any marketing communication from the marketer or others.

**Contextual Advertising** -- Advertising based on a consumer's current visit to a Web page or search query. Online behavioral advertising, as defined in this Article's Glossary of Terms, does not include contextual advertising.

**Control** -- of an entity means that one entity (1) is under significant common ownership or operational control of the other entity, or (2) has the power to exercise a controlling influence over the management or policies of the other entity. In addition, for an entity to be under the control of another entity and thus be treated as a first party under these principles, the entity must adhere to online behavioral advertising policies that are not materially inconsistent with the other entity's policies.

**First Party** -- is the entity that is the owner of the website, or those of its affiliates, and has control over the website with which the consumer interacts.

**Online Behavioral Advertising** -- means the collection of information from a particular computer or device regarding Web viewing behaviors over time and across non-affiliate websites for the purpose of using such information to predict user preferences or interests to deliver advertising to that computer or device based on the preferences or interests inferred from such Web viewing behaviors. Online behavioral advertising does not include the activities of first parties, ad delivery or ad reporting, or contextual advertising (i.e. advertising based on the

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

content of the Web page being visited, a consumer's current visit to a Web page, or a search query). The activities of search engines fall within the scope of online behavioral advertising to the extent that they include collection of data regarding Web viewing behaviors over time and across non-affiliate websites in order to deliver advertising to that computer or device based on the preferences or interests inferred from such Web viewing behaviors.

**Personally Identifiable Information & Non-Personally Identifiable Information** -- for purposes of this Article, personally identifiable information refers to name, address, or other information that identifies a specific individual; non-personally identifiable information (non-PII) refers to information, such as a computer's IP address, that does not tie the information to a specific individual. Non-personally identifiable information collected by third parties from websites for online behavioral advertising should be combined with personally identifiable information collected about an individual for marketing purposes only with that individual's consent, unless the individual was provided with notice and choice with respect to such potential combination at the time the non-personally identifiable information was collected and did not opt out.

**Service Provider** -- refers to an organization that collects and uses information from all or substantially all URLs traversed by a Web browser across websites for purposes of online behavioral advertising. Examples of service providers in this context are internet access service providers and providers of desktop applications software such as Web browser "tool bars."

**Third Party** -- an entity is a third party to the extent that it engages in online behavioral advertising on a non-affiliate's website.

**MOBILE SERVICE COMMERCIAL MESSAGE SOLICITATIONS (MSCMs) DELIVERED TO A WIRELESS DEVICE**
***Article #39***

A Mobile Service Commercial Message (MSCM) is a commercial electronic mail message that is transmitted directly to a wireless device that is utilized by a subscriber of a commercial mobile service. Marketers sending MSCMs messages should obtain prior express consent from recipients and should abide by CAN-SPAM, the Federal Communications Commission's Wireless Email Rule, DMA Guidelines for Online & Mobile Marketing, and any additional federal and state regulations.

**COMMERCIAL SOLICITATIONS ONLINE**
***Article #40***

1. DEFINITION:
This article refers to addressable commercial solicitations initiated online by marketers (or their affiliates); including commercial solicitations sent to an individual's email address or another "direct contact point." For purposes of this article, a "direct contact point" is defined as a user ID or other unique identifier at which an individual can be communicated with online or via a mobile Internet device. This may include, for

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

example, a text message number, personalized activity feed identifier (e.g., "twitter" ID), or user ID for postings on or to a personal social network profile page.

Nothing in this Article or definition is meant to restrict or prohibit the use of aggregated or anonymized data pertaining to direct contact points, the use of profile data for online behavioral advertising (OBA,) or online banner advertising.

2. CHANNEL APPROPRIATE CONSENT:
Marketers (or their affiliates) may initiate commercial solicitations online to customers or prospects under the following circumstances

- individuals have given their channel-appropriate consent to the marketer (including, but not limited to, through the terms of a social media platform) to receive solicitations online, or
- Individuals did not opt out after the marketer has given notice of the opportunity to opt out from receiving solicitations online, or
- The marketer has received assurance from the third party list provider that the individuals whose email addresses or other direct contact points appear on that list:
    - have given their channel-appropriate consent to receive solicitations online, or
    - have already received notice of the opportunity to opt out from receiving online solicitations and have not opted out, and DMA's Email Preference Service (E-MPS) suppression file was used by the third party.

3. CHANNEL APPROPRIATE CHOICE:

Marketers should furnish individuals with the appropriate notice or a point of contact and an Internet-based mechanism individuals can use to:

- Request that the marketer not send them future online solicitations and
- Request that the marketer not rent, sell, or exchange their email addresses or other direct contact point data for online solicitation purposes.

If individuals request that they be added to the marketer's in-house suppression list, then the marketer may not rent, sell, or exchange their email addresses or other direct contact point data with third parties for solicitation purposes.

The above requests should be honored within 10 business days, and the marketer's opt-out mechanism should be active for at least 30 days from the date of the solicitation.

Marketers that rent, sell, or exchange personally identifiable information need to provide individuals with notice of a mechanism to opt out of personally identifiable information transfer to third-party marketers.

Solicitations sent via email should disclose the marketer's identity and street address. The subject and "from" lines should be clear, honest, and not misleading, and the subject line should reflect the actual content of the message so that recipients understand that the

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

email is an advertisement. The header information should be accurate. A marketer should also provide specific contact information at which the individual can obtain service or information.

**EMAIL AUTHENTICATION**
***Article #41***
Marketers that use email for communication and transaction purposes should adopt and use identification and authentication protocols.

**USE OF SOFTWARE OR OTHER SIMILAR TECHNOLOGY INSTALLED ON A COMPUTER OR SIMILAR DEVICE**
***Article #42***
Marketers should not install, have installed, or use, software or other similar technology on a computer or similar device that initiates deceptive practices or interferes with a user's expectation of the functionality of the computer and its programs. Such practices include, but are not limited to, software or other similar technology that:

- Takes control of a computer (e.g., relaying spam and viruses, modem hijacking, denial of service attacks, or endless loop pop-up advertisements)
- Deceptively modifies or deceptively disables security or browser settings or
- Prevents the user's efforts to disable or uninstall the software or other similar technology

Anyone that offers software or other similar technology that is installed on a computer or similar device for marketing purposes should:

- Give the computer user clear and conspicuous notice and choice at the point of joining a service or before the software or other similar technology begins operating on the user's computer, including notice of significant effects* of having the software or other similar technology installed
- Give the user an easy means to uninstall the software or other similar technology and/or disable all functionality
- Give an easily accessible link to your privacy policy and
- Give clear identification of the software or other similar technology's name and company information, and the ability for the user to contact that company

*Determination of whether there are significant effects includes, for example:

- Whether pop-up advertisements appear that are unexpected by the consumer
- Whether there are changes to the computer's home page or tool bar
- Whether there are any changes to settings in security software, such as a firewall, to permit the software to communicate with the marketer or the company deploying the software, or
- Whether there are any other operational results that would inhibit the user's expected functionality

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

Cookies or other passive means of data collection, including Web beacons, are not governed by this Guideline. Article #38 provides guidance regarding cookies and other passive means of data collection.

**SOCIAL MEDIA & ONLINE REFERRAL MARKETING**
***Article #43***

1. DEFINITION:
Social media marketing is the use of online communities and/or social networks (via services, websites or platforms – each a "channel") to send a commercial marketing message to an individual and/or to that individual's own network. (Social media involves user interactions which the individual has agreed to display and to be shared.) Online referral marketing is a technique marketers use to generate new marketing leads.

Typically, the online marketer encourages an individual to do the following:

1. Forward a commercial solicitation to another individual, or
2. Provide the marketer with personally identifiable information, such as name and/or address/email address, about the referred individual so the marketer may contact that person directly, or
3. Share or display a social ad and/or otherwise engage with a social media network or channel by, for example, "friending" (an invitation to establish a social media relationship), posting or otherwise sharing or displaying the ad on or via a social media channel (e.g., an activity feed such as tweeting). This interaction may involve a request from the marketer that the individual provide profile or social data about himself/herself or others in his/her network. Profile data may include, but is not limited to: name, age, gender, location, expressed personal interests and preferences, and photos. Profile data also extends to what is known as the "social graph," which are explicit online connections and interactions between individuals ("friends").

2. USING INFORMATION PROVIDED BY THE INDIVIDUAL AND/OR ABOUT OTHERS:

If personally identifiable information about an individual is given to a marketer through social media channels and/or online referral marketing rather than directly from an individual, then the following steps should be taken:

A marketer should not use personally identifiable information about a referred individual provided online by another individual unless:

- The marketer has previously disclosed, in a clear and conspicuous manner, to the referring individual the intended uses of the information (Note: All notices and disclosures referenced in this article should be made in clear and conspicuous manner and in keeping with DMA's Ethical Guidelines.);

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

- The marketer has disclosed to the referring individual that his or her own contact information will be provided to those individuals they have referred to the marketer;
- The marketer discloses to the referred person the fact that his or her contact information was obtained from another individual. The marketer should make the referring person's contact information available in the first communication to the prospect; and
- The marketer provides channel appropriate choices to the referred individual regarding receiving future communications. (Note: The frequency and type of choice provided (e.g., first communication vs. every communication) must be appropriate for the channel being used to contact the individual. For example, email communications must include an opt-out notice and choice in every communication.)

Since marketers have not had a direct contact with the referred individual, marketers should not contact referred individuals who are on their in-house suppression lists.

Marketers should not sell, rent, share, transfer, or exchange a referred email address or referred personally identifiable information unless they receive prior permission from each referred person to do so.

Prior express consent must be obtained before initiating contact using a marketing channel or platform for which a referred individual will incur a fee for receipt of the marketing message, such as premium-rate text messaging via a mobile device. (Articles #54-#58.) In addition, online referral marketers offering an incentive should adhere to Article #39 (Mobile Service Commercial Messages).

3. SENDING COMMERCIAL SOLICITATIONS VIA INDIVIDUALS' SOCIAL MEDIA NETWORKS:

If a marketer is contacting an individual to send marketing messages to that individual's network of contacts, each of the following steps should be taken:

- A marketer should obtain an individual's prior consent to participate in the social media marketing process whereby the marketer is added as a "friend" or a contact to be shared with the individual's other social media contacts;
- Profile data that contains personally identifiable information provided by an individual on a social networking site should not be shared with third parties without that individual's prior consent unless the user has agreed to post or populate such information in an unrestricted publicly accessible location;
- If tracking data is being collected as part of the social media marketing process for purposes of online behavioral advertising, please refer to Article #38;
- If a social or interactive advertising application (incorporating user-generated content or user interactions that the individual has consented to being shared) is being distributed to the individual's contacts, a preview should be provided to that individual for review and approval before it is distributed by the marketer to that individual's contacts. The recipient of the ad should be provided with an opportunity

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

to opt out of receiving future communications from the marketer and having his/her information shared; and

- Marketers should not retain personally identifiable information used for social marketing purposes except for marketing purposes, and should not share such data with any third party without the individual's prior consent unless the user has agreed to post or populate such information in an unrestricted publicly accessible location.

Marketers using testimonials and endorsements in any media, including but not limited to social media channels (e.g., online message boards, blogging, etc.) and "word-of-mouth" marketing, should comply with Article #21 – Testimonials & Endorsements – of these Guidelines. Additionally, where marketing to children is permitted by law, marketers using social media channels should comply with Articles #13 - #16 of these Guidelines and ensure the marketing is suitable for the child, taking into account the age range, knowledge, sophistication, and maturity of their intended audience.

4. OPERATORS OF SOCIAL MEDIA PLATFORMS & FORUMS:

In addition to complying with the aforementioned items, operators of social media networks, platforms or other social media forums should:

- Post their privacy policy in a prominent location on their site so that it is clear and conspicuous;
- Advise individual users about their privacy policies, data deletion policy and the steps users should follow to change their privacy settings, to deactivate or to delete their accounts;
- Prevent games, quizzes and other applications developed by third parties from accessing personally identifiable information from an individual user until the marketer has provided clear and conspicuous notice to the individual before accessing their information (notice must include an opportunity to refuse marketing communications associated with the application), or obtains prior consent from that user for each category of personal information accessed.

**EMAIL APPENDING TO CONSUMER RECORDS**
***Article #44***

Definition of email address appending: Email address appending is the process of adding a consumer's email address to that consumer's record. The email address is obtained by matching those records from the marketer's database against a third-party database to produce a corresponding email address.

A marketer should append a consumer's email address to its database only when the consumer gives a marketer permission to add his or her email address to the marketer's database; or

1. There is an established business relationship with that consumer either online or offline, and

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

2. The data used in the append process are from sources that provided notice and choice regarding the acceptance of receiving third-party email offers and where the consumer did not opt out, and
3. Reasonable efforts are taken to ensure the appending of accurate email addresses to the corresponding consumer records

Marketers should not send emails to appended email addresses that are on their in-house email suppression files. Marketers should not send Mobile Service Commercial Messages (MSCMs) to appended email addresses that belong to wireless handsets or devices unless the recipient has provided prior express authorization to receive such messages from the sender. A marketer should not sell, rent, transfer, or exchange an appended email address of a consumer unless it first offers notice and choice to the consumer. All messages to an email appended address should include a notice and choice to continue to communicate via email.

Marketers should have in place appropriate record-keeping systems to ensure compliance with these guidelines.

# *Telephone Marketing to Landline & Wireless Devices*

**REASONABLE HOURS**
***Article #45***
Telephone contacts, whether to a landline or wireless handset or device, should be made during reasonable hours as specified by federal and state laws and regulations.

**TAPING OF CONVERSATIONS**
***Article #46***
Taping of telephone conversations by telephone marketers should only be conducted with notice to or consent of all parties, or the use of a beeping device, as required by applicable federal and state laws and regulations.

**RESTRICTED CONTACTS**
***Article #47***
A marketer should not knowingly call or send a voice solicitation message to a consumer who has an unlisted or unpublished telephone number except in instances where that specific number was provided by the consumer to that marketer for that purpose. A marketer should maintain an in-house Do-Not-Call list and refrain from calling numbers for solicitation purposes that are on the marketer's in-house Do-Not-Call list.

A marketer should not knowingly call a wireless device, except in instances where the recipient has provided prior express consent to receive such calls from that marketer.

Prior to contacting a landline or wireless device, marketers should use applicable federal and DMA Wireless Suppression Files or another comprehensive wireless suppression service. Such suppression files should assist marketers in determining whether or not they are contacting a wireless device, including landline numbers that have been ported to wireless handsets or devices.

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

A marketer should use DMA's Telephone Preference Service as required in Article #31 and must use the federal Do-Not-Call registry and state Do-Not-Call lists when applicable prior to using any outbound calling list. Telemarketing calls may be made to landline telephones, where the telemarketer has an established business relationship with the individuals even if the individual is on the national registry. An established business relationship is defined as those persons with whom the marketer has had a transaction/received a payment within the last 18 months or those persons who have inquired about the marketer's products/services within the last 3 months. (Note: State laws may vary. DMA's website at: www.the-dma.org/government/donotcalllists.shtml attempts to provide current information on state Do-Not-Call lists.) Consumers who have provided informed, written permission to the marketer do not need to be suppressed by any Do-Not-Call list. Individuals can add or remove themselves from company-specific Do-Not-Call lists either orally or in writing.

Marketers should not use randomly or sequentially generated numbers in sales or marketing solicitations.

**CALLER-ID/AUTOMATIC NUMBER IDENTIFICATION REQUIREMENTS**
***Article #48***
Marketers engaging in telemarketing to landline and wireless telephone numbers should generate caller identification information, including:

- A telephone number for the seller, service bureau, or customer service department that the consumer can call back during normal business hours to ask questions and/or to request not to receive future calls by making a do-not-call request, and
- Whenever the technology is available from the marketer's telecommunications carrier, the name of the seller on whose behalf the call is placed or service bureau making the call.

Marketers should not block transmission of caller identification or transmit a false name or telephone number.

Telephone marketers using automatic number identification (ANI) should not rent, sell, transfer, or exchange, without customer consent, landline telephone numbers gained from ANI, except where a prior business relationship exists for the sale of directly related goods or services. With regard to mobile telephone numbers, marketers should abide by Articles #31 and #35.

**USE OF AUTOMATED DIALING EQUIPMENT, "ROBO" CALLING**
***Article #49***

Marketers using automated dialing equipment should allow 15 seconds or four rings before disconnecting an unanswered call.

Marketers should connect calls to live representatives within two seconds of the consumer's completed greeting (except in cases where a prerecorded marketing message is used, in accordance with Article #55).

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

If the connection does not occur within the two-second period, then the call is considered abandoned whether or not the call is eventually connected.

Whenever a live representative is not available within two seconds of the consumer's completed greeting, the marketer should play a prerecorded identification message that includes the seller's name and telephone number, states that the call was made for "telemarketing purposes," and provides a telephone number at which the consumer can request not to receive future marketing calls. The message must also contain an automated, interactive voice- and/or key press-activated opt-out mechanism that enables the called party to make a do not call request prior to terminating the call, including brief explanatory instructions on how to use such mechanism.

When the called party elects to opt-out using such mechanism, the mechanism must automatically record the called party's number to the seller's do not call list and immediately terminate the call.

Repeated abandoned or "hang up" calls to consumers' residential or wireless telephone numbers should be minimized.

In no case should calls be abandoned more than:

Three percent of answered calls within each calling campaign, if the campaign is less than 30 days, or separately over each successive 30-day period or portion of that period during which the campaign continues (unless a more restrictive federal or state law applies), or
twice to the same telephone number within a 48-hour time period.

Marketers should only use automated dialing equipment that allows the telephone to immediately release the line when the called party terminates the connection.

When using any automated dialing equipment to reach a multi-line location, whether for business-to-consumer or business-to-business marketing, the equipment should release each line used before connecting to another.

Companies that manufacture and/or sell automated dialing equipment should design the software with the goal of minimizing abandoned calls to consumers. The software should be delivered to the user set as close to 0% as possible. Manufacturers should distribute these Guidelines for Automated Dialing Equipment to purchasers of dialing equipment and recommend that they be followed.

The dialers' software should be capable of generating a report that permits the user of the equipment to substantiate compliance with the guideline.

*Glossary of Terms Used*

**Automated Dialing Equipment** -- any system or device that automatically initiates outgoing call attempts (including text messages) in a random or sequential manner or from a predetermined list of phone numbers. This term includes any equipment that constitutes an

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

"automatic telephone dialing system" as defined under the Telephone Consumer Protection Act ("TCPA") and/or the FCC's TCPA regulations.

**Abandoned Call** -- a call placed by automated dialing equipment to a consumer which when answered by the consumer, (1) breaks the connection because no live agent is available to speak to the consumer, or (2) no live agent is available to speak to the consumer within 2 seconds of the consumer's completed greeting.

**Abandonment Rate** -- the number of abandoned calls over a 30-day period divided by the total number of calls that are answered by a live consumer. Calls that are not answered by a live consumer do not count in the calculation of the abandonment rate.

**Campaign** -- refers to an offer of the same good or service for the same seller. As long as the same good or service is being offered by the same seller, the offer is part of a single campaign, regardless of whether there are changes in the terms of the offer or the wording of any marketing material, including any telemarketing script, used to convey the offer. This definition applies to Article 48 only and is based on the FTC's definition of a "campaign" for purposes of calculating the abandonment rate.

**Report** -- reportable information that should be made available which contains key points, including the percentage of abandoned calls.

**Telemarketing** – a telephone call, prerecorded message or text message placed to a landline or wireless number for the purpose of promoting, advertising, marketing or offering goods or services.

**USE OF PRERECORDED VOICE & TEXT MESSAGING**

***Article #50***

Marketers who use prerecorded voice messaging should not automatically terminate calls or provide misleading or inaccurate information when a live consumer answers the telephone.

**Consent Required:**

Marketers should only use text messaging sent via Automated Dialing Equipment or prerecorded voice to sell goods or services if they have first obtained the call recipient's prior express written agreement to receive prerecorded messages through a written form which may be electronic to the extent permitted by law. In obtaining the consumer's express written agreement, a marketer should observe the following:

- Before obtaining the consumer's informed consent, the marketer should clearly and conspicuously disclose that the purpose of the agreement is to allow the marketer to make prerecorded message calls or send autodialed texts to the consumer.

- The written agreement should evidence the consumer's informed consent to receive prerecorded calls or text messages by or on behalf of the specific marketer

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

- The marketer should not require that the consumer agree to receive prerecorded calls or text messages as a condition of purchasing any good or service.

- Disclosures that the individual's consent allows the marketer to make prerecorded calls and/or text messages, and that providing consent is not a condition of any purchase, should be made at the time the marketer is seeking written consent.

- Disclosure that by executing the agreement, the individual authorizes the marketer to deliver to the individual marketing text messages using Automatic Dialing Equipment or a prerecorded voice;

- The agreement should include the consumer's telephone number and signature.

- Marketers may obtain the written agreement electronically in accordance with applicable laws such as the E-Sign Act.

**Choice Mechanism:** Marketers should provide an in-call opt-out mechanism that the call recipient can use to be placed on the company's do-not-call list during the each prerecorded call, or provide an opt-out mechanism within the text message. The type of opt-out mechanism that the marketer should provide depends on whether the call can be answered by a live person or by an automated device. If the marketer is able to determine whether a prerecorded call has been answered by a live person or an automated device, the marketer should tailor the prerecorded message to include the appropriate opt-out mechanism (either option 1 or 2 below):

(1) If the call is answered by a live person, then the marketer should provide an automated interactive voice and/or keypress-activated opt-out mechanism that the recipient can use to make an opt-out request. The mechanism should be available for use at any time during the message.

(2) If the call is answered by an answering machine or voicemail system, then the prerecorded message should provide a toll-free telephone number that the recipient can call to make an opt-out request at any time during the telemarketing campaign. The telephone number provided should connect directly to an automated interactive voice and/or keypress-activated opt-out mechanism. Consumers should be able to call at any time of the day, and on any day, during the duration of the campaign.

If the marketer is not able to determine whether a prerecorded call has been answered by a live person or an automated device, the prerecorded message should include both options 1 and 2.

The interactive voice and/or keypress-activated opt-out mechanism – regardless of whether the prerecorded call can be answered by a live person or automated answering device – should have the following features:

The opt-out mechanism should automatically add the number called to the entity's company-specific do-not-call list; and
the opt-out mechanism should immediately disconnect the call once the opt-out request is made.

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

Marketers may use prerecorded messages that provide information, but do not induce the purchase of goods or services, without first obtaining prior written consent and without providing an opt-out mechanism. Such calls should promptly disclose the identity of the caller at the outset of the call and provide a valid telephone number sometime during the call.

**USE OF TELEPHONE FACSIMILE MACHINES**
***Article #51***
Unless there is an established business relationship, or unless prior permission has been granted, advertisements, offers and solicitations, whether sent to a consumer or a business, should not be transmitted to a facsimile machine, including computer fax machines. An established business relationship in the fax context is defined as a prior or existing relationship based on a voluntary, two-way communication between the sender and recipient of the fax. Such communication includes a purchase, transaction, inquiry, or application for or about goods or services offered by the sender. For business relationships formed after July 9, 2005, the fax number must be provided voluntarily by the recipient to the sender, or be made available voluntarily by the recipient in a directory, advertisement, or Internet site.

Each permitted transmission to a fax machine must clearly contain on the first page:

- the date and time the transmission is sent;
- the identity of the sender which is registered as a business with a state;
- the telephone number of the sender or the sending machine; and
- a clear and conspicuous opt-out notice.

The opt-out notice should:

- clearly state that the recipient may opt out of any future faxes and provide clear instructions for doing so;
- provide a domestic telephone number and fax number for recipients to transmit an opt-out request; and
- unless the telephone or fax number is toll-free, a cost-free mechanism to submit an opt-out request.

Senders must accept opt-out requests at any time.

Opt-out requests must be honored in 30 days, or sooner if feasible. An opt-out request terminates permission to send future faxes based only on an established business relationship.

**PROMOTIONS FOR RESPONSE BY TOLL-FREE AND PAY-PER-CALL NUMBERS**
***Article #52***
Promotions for response by 800 or other toll-free numbers should be used only when there is no charge to the consumer for the call itself and when there is no transfer from a toll-free number to a pay call.

Promotions for response by using 900 numbers or any other type of pay-per-call programs should clearly and conspicuously disclose all charges for the call. A preamble at the beginning of the 900 or other pay-per-call should include the nature of the service or program, charge per

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

minute, and the total estimated charge for the call, as well as the name, address, and telephone number of the sponsor. The caller should be given the option to disconnect the call at any time during the preamble without incurring any charge. The 900 number or other pay-per-call should only use equipment that ceases accumulating time and charges immediately upon disconnection by the caller.

**DISCLOSURE AND TACTICS**

***Article #53***

Marketers should make the following initial disclosures promptly:

- The identity of the seller or charitable organization on behalf of which the call is made;
- That the purpose of the call is to sell goods or services or to solicit a charitable contribution;
- The nature of the goods or services offered during the call (if applicable); and
- If a prize promotion is offered, that no purchase or payment is necessary to be able to win a prize or participate in a prize promotion and that any purchase or payment will not increase the person's chances of winning.

Prior to asking consumers for payment authorization, telephone marketers should disclose the cost of the merchandise or service and all terms and conditions, including payment plans, whether or not there is a no refund or a no cancellation policy in place, limitations, and the amount or existence of any extra charges such as shipping and handling and insurance. At no time should high pressure tactics be utilized.

## *Mobile Marketing*

Please refer to the Glossary of Terms at the end of this section for the complete definitions of key concepts and terms used within this section.

**OBTAINING CONSENT TO CONTACT MOBILE DEVICES**

***Article #54***

Marketers should obtain prior express written consent from existing and prospective customers before using automated dialing equipment to send mobile marketing to a wireless device. When obtaining prior express written consent, marketers shall meet the following requirements:

1) Before obtaining the consumer's informed consent, the marketer should clearly and conspicuously disclose that the purpose of the agreement is to allow the marketer to make autodialed calls to the consumer's wireless telephone.
2) The written agreement should evidence the consumer's informed consent to receive autodialed calls by or on behalf of the specific marketer.
3) The marketer shall not require that the consumer agree to receive prerecorded calls as a condition of purchasing any good or service.
4) The marketer shall disclose that the individual's consent allows the marketer to make autodialed calls to the person's wireless telephone and that providing consent is not a condition of any purchase.
5) The agreement shall include the consumer's telephone number and signature.

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

6) Marketers may obtain the written agreement electronically in accordance with applicable laws such as the E-Sign Act.

**PROVIDING NOTICE AND CHOICE ABOUT MOBILE MARKETING PRACTICES**
***Article #55***
Marketers that send or intend to send mobile messages should publish an easily accessible notice of their information practices (which includes but is not limited to a notice in their respective privacy policies) with regards to mobile marketing. The notice must include sufficient information to allow individuals to make an informed choice about their interaction with the marketer. This should include, at minimum, any applicable terms and conditions, details of the marketer's information handling practices and clear directions about how to unsubscribe from future solicitations.

The mobile marketing notice should be easy to find, read and understand on mobile screens, and should comply with existing DMA Guidelines. Of particular note, mobile marketers should review and comply with the Terms of the Offer (Articles #1-6, #8, #9), Advance Consent Marketing (Article #12), Special Offers & Claims (Articles #17-#21), and Sweepstakes (Articles #22-#27).

**MOBILE OPT-OUT REQUESTS**
***Article #56***
Every mobile marketing message sent must include a simple and easy-to-use mechanism through which the individual can opt out of receiving future mobile marketing messages. Where possible, the opt-out mechanism provided should allow the recipient to opt out via reply text message.

Where individuals respond to a marketer indicating that they do not wish to receive future mobile marketing messages (e.g. an individual replies "STOP"), the marketer should honor the request. Mobile opt-out requests should be honored within 10 days of being received and in accordance with Article #31.

**SPONSORSHIP OR AFFILIATE MOBILE MARKETING**
***Article #57***
A marketer may include an affiliate or sponsorship message within a mobile marketing communication, providing that the recipient has provided prior express consent to receive mobile marketing communications from that marketer and that it is clear from the mobile marketing communication that the message has been sent by that marketer and not by the sponsor. A marketer should also comply with Article #8 - Disclosure of Sponsor and Intent.

**LOCATION-BASED MOBILE MARKETING**
***Article #58***
Marketers sending location-based mobile marketing messages to recipients should adhere to Articles #54-56. In addition, marketers should inform individuals how location information will be used, disclosed and protected so that the individual may make an informed decision about whether or not to use the service or consent to the receipt of such communications. Location-based information must not be shared with third-party marketers unless the individual has given prior express consent for the disclosure.

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

**MOBILE SUBSCRIPTION SERVICES AND PREMIUM-RATE MOBILE SERVICES**
***Article #59***

Mobile subscription services and mobile premium-rate products and/or services should be offered and delivered in accordance with DMA Guidelines, in particular the Terms of the Offer (Articles #1-6, #8, #9), Advance Consent Marketing (Article #12), Marketing to Children (Article #13-#16), Special Offers & Claims (Articles #17-#21) and Sweepstakes (Articles #22-#27). All advertising and marketing for mobile subscription services or premium-rate mobile products/services should clearly define the service offered and outline the terms and conditions of the offer in accordance with these articles. Mobile subscription services or premium-rate mobile services should not be supplied unless the recipient has actively requested to receive the specific service to be supplied. Further, prior express consent should be obtained from a recipient prior to supplying additional or separate mobile subscription services and premium-rate mobile services at a subsequent date.

In accordance with Articles #12 and #48, and prior to sending or charging recipients for mobile subscription services and/or premium-rate mobile products/services, marketers should:

- provide the individual with an opportunity to see or hear the terms and conditions relating to the subscription service, including:
  - the cost per unit or the total cost of the subscription or premium-rate service;
  - the term of the subscription or premium-rate service;
  - the frequency of the subscription or premium-rate service;
  - payment intervals;
  - how to terminate the subscription or premium-rate service including any terms and conditions that apply to such termination.

- obtain prior express consent from recipients to receive and be charged for said subscriptions, products and/or services;

- inform recipients in the initial offer and in renewal reminders of their right to cancel their participation in the plan, and include contact information within the initial and renewal messages that allows the recipient to directly contact them;

- provide renewal reminders at the frequency specified in the initial offer;

- promptly honor requests for refunds due upon a consumer's cancellation of the plan;

- abide by Articles #13-#16 and #48, and take reasonable precautions and implement adequate technical accountability and authentication measures to ascertain that

  - (a) the mobile phone number or email address provided indeed belongs to the intended recipient of the subscriptions, products or services, and

  - (b) periodically, and not less than once a month, include contact information within the mobile subscription service message or premium-rate mobile service message that allows the individual to directly contact the marketer.

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

### *Glossary of Terms Used*

- **Individuals** -- refers to the recipients or potential recipients of mobile marketing communications. For purposes of opting out (refer to Article #56), individuals refers to the number(s) and/or electronic address(es) of the wireless device(s) used by the recipients.

- **Location-Based Services** --marketing text message targeted to a recipient dependent on their location, by a handset or user's physical location.

- **Mobile Marketing** -- refers to a sales and promotion technique in which promotional materials are delivered to a wireless phone or device. It can include both 'direct mobile marketing' (i.e. marketing communications targeted, sent or "pushed" to a wireless handset or device, such as marketing text messages) and 'indirect mobile marketing' (i.e. marketing that can be accessed or "pulled" by an individual via a wireless handset or device such as a mobile enabled website). Examples include the sending of SMS, MMS or WAP push messages, Bluetooth messaging and other interrupt based marketing to wireless devices.

- **Mobile Service Commercial Message (MSCM)** -- a commercial electronic message that is transmitted directly to a wireless device that is utilized by a subscriber of commercial mobile service.

- **Multi-Media Messaging Services (MMS)** -- an extension of a the Short Message Service Technology that permits the marketer to send marketing messages to a wireless handset that include multimedia objects such as images, audio and video.

- **Mobile Subscription Service** --a service that is provided periodically or on an ongoing basis that is delivered to an individual via a wireless handset or device. This includes free services and paid subscription services.

- **Premium Rate Mobile Services** -- a service that is provided in a single instance, periodically or on an ongoing basis that is delivered to an individual via a wireless handset or device whereby the recipient pays a rate that exceeds the standard tariff to either receive or send a mobile message.

- **Prior Express Consent** -- refers to affirmative, express and informed consent. A marketer should be able to demonstrate that recipients knowingly and affirmatively consented to be contacted on their wireless devices by that marketer for any purposes. Consent may be obtained orally, in writing or electronically. The notice to obtain consent should include a clear and conspicuous disclosure and require an active step on the part of the recipient to demonstrate that he/she agrees to receive the communication and/or product or service. This consent may be obtained via any channel. A pre-checked box, for example, would not suffice as an adequate means for obtaining consent.

- **Recipient** -- any natural or legal person or business that receives a mobile marketing communication.

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

- **Short Message Service (SMS)** -- a marketing message sent as a text message.
- **Text message** --a brief electronic message sent between mobile phones, containing text composed by the sender, usually input via a lettering system on a cell phone's numeric keypad.
- **Wireless Application Protocol (WAP)** -- Refers to a secure specification that allows users to access information instantly via handheld wireless devices such as mobile phones, pagers, two-way radios, smartphones and communicators.
- **Wireless** -- Refers to telecommunications in which electromagnetic waves (rather than some form of wire) carry the signal over part or all of the communication path.
- **Wireless Handset** -- Umbrella term for devices, typically with keys to input data, that are mobile and can be operated by hand. Examples are mobile phones, pagers, two-way radios, smartphones and communicators.

## FUNDRAISING

***Article #60***

In addition to compliance with these guidelines, fundraisers and other charitable solicitors should, whenever requested by donors or potential donors, provide financial information regarding use of funds.

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

**LAWS, CODES, AND REGULATIONS**
***Article #61***
Direct marketers should operate in accordance with laws and regulations of the United States Postal Service, the Federal Trade Commission, the Federal Communications Commission, the Federal Reserve Board, and other applicable federal, state, and local laws governing advertising, marketing practices, and the transaction of business.

## *DMA Resources*

- "*Do the Right Thing*" Compliance Guide
- *Commitment to Consumer Choice* Member Compliance Guide
- Preference Services Subscriber Information
- DMA's consumer preference website: www.DMAchoice.org
- Privacy Policy Generators
- Environmental Resources and Generator (The "Green 15")
- E-Commerce Integrity Resource Center
- Information Security: Safeguarding Personal Data in Your Care

See DMA's website for numerous other resources developed by the Department of Corporate & Social Responsibility:
www.thedma.org/compliance

DMA can also provide its members with information on the following Federal Trade Commission (FTC) and Federal Communications Commission (FCC) regulations and rules affecting direct marketers:

***FTC:***
- Mail or Telephone Order Merchandise Rule
- Telemarketing Sales Rule
- Children's Online Privacy Protection Rule
- Negative Option Rule…and much more!

***FCC:***
- Telephone Consumer Protection Act

**Report a Complaint:**
To report a complaint regarding a marketing practice that may violate these Guidelines, please email us at ethics@the-dma.org; or submit a written complaint with a copy of the marketing promotion to: Attention: DMA Ethics & Consumer Affairs, 1615 L Street NW, Washington, DC 20036.

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

### *DMA's Department of Corporate & Social Responsibility*

In its continuing efforts to improve and advance the practices of direct marketing and the marketer's relationship with customers, the DMA sponsors several activities through its Department of Corporate & Social Responsibility:

- Ethical Guidelines are maintained, updated periodically, and distributed to the direct marketing community.
- The Committee on Ethical Business Practice investigates and examines promotions and practices throughout the direct marketing community that are brought to its attention.
- The Ethics Policy Committee revises the Guidelines as needed, and initiates programs and projects directed toward improved ethical awareness in the direct marketing arena.
- The Committee on the Environment and Social Responsibility identifies ways for members to be good corporate citizens and recommends relevant best practices.
- DMA's Commitment to Consumer Choice builds consumer trust in the marketing process by offering individual choices online and offline.
  www.DMAchoice.org offers consumers assistance in managing their mail and email marketing preferences, and provides consumer education. www.Aboutads.info provides consumers choices for online behavioral advertising. The DMA CSR department oversees compliance by marketers to ensure consumer choices are being honored.

For additional information contact DMA's Washington Office:

1615 L Street, NW, Suite 1100
Washington, DC 20036
202.955.5030
Fax: 202.955.0085
www.dmaresponsibility.org
Email: ethics@the-dma.org

***

Direct Marketing Association, Inc.
Headquarters:
1120 Avenue of the Americas
New York, New York 10036-6700
212.768.7277
Fax: 212.302.6714
www.thedma.org

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

# Exhibit B

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

# The American Marketing Association Statement of Ethics

## Preamble

The American Marketing Association commits itself to promoting the highest standard of professional ethical norms and values for its members (practitioners, academics and students). Norms are established standards of conduct that are expected and maintained by society and/or professional organizations. Values represent the collective conception of what communities find desirable, important and morally proper. Values also serve as the criteria for evaluating our own personal actions and the actions of others. As marketers, we recognize that we not only serve our organizations but also act as stewards of society in creating, facilitating and executing the transactions that are part of the greater economy. In this role, marketers are expected to embrace the highest professional ethical norms and the ethical values implied by our responsibility toward multiple stakeholders (e.g., customers, employees, investors, peers, channel members, regulators and the host community).

## Ethical Norms

As Marketers, we must:

1. Do no harm. This means consciously avoiding harmful actions or omissions by embodying high ethical standards and adhering to all applicable laws and regulations in the choices we make.
2. Foster trust in the marketing system. This means striving for good faith and fair dealing so as to contribute toward the efficacy of the exchange process as well as avoiding deception in product design, pricing, communication, and delivery of distribution.
3. Embrace ethical values. This means building relationships and enhancing consumer confidence in the integrity of marketing by affirming these core values: honesty, responsibility, fairness, respect, transparency and citizenship.

## Ethical Values

Honesty – to be forthright in dealings with customers and stakeholders. To this end, we will:

- Strive to be truthful in all situations and at all times.
- Offer products of value that do what we claim in our communications.
- Stand behind our products if they fail to deliver their claimed benefits.
- Honor our explicit and implicit commitments and promises.

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

Responsibility – to accept the consequences of our marketing decisions and strategies. To this end, we will:

- Strive to serve the needs of customers.
- Avoid using coercion with all stakeholders.
- Acknowledge the social obligations to stakeholders that come with increased marketing and economic power.
- Recognize our special commitments to vulnerable market segments such as children, seniors, the economically impoverished, market illiterates and others who may be substantially disadvantaged.
- Consider environmental stewardship in our decision-making.

Fairness – to balance justly the needs of the buyer with the interests of the seller. To this end, we will:

- Represent products in a clear way in selling, advertising and other forms of communication; this includes the avoidance of false, misleading and deceptive promotion.
- Reject manipulations and sales tactics that harm customer trust.

  Refuse to engage in price fixing, predatory pricing, price gouging or "bait-and-switch" tactics.

- Avoid knowing participation in conflicts of interest.

  Seek to protect the private information of customers, employees and partners.

Respect – to acknowledge the basic human dignity of all stakeholders. To this end, we will:

- Value individual differences and avoid stereotyping customers or depicting demographic groups (e.g., gender, race, sexual orientation) in a negative or dehumanizing way.
- Listen to the needs of customers and make all reasonable efforts to monitor and improve their satisfaction on an ongoing basis.
- Make every effort to understand and respectfully treat buyers, suppliers, intermediaries and distributors from all cultures.
- Acknowledge the contributions of others, such as consultants, employees and coworkers, to marketing endeavors.
- Treat everyone, including our competitors, as we would wish to be treated.

Electronically Filed - St Louis County - March 26, 2021 - 04:30 PM

Transparency – to create a spirit of openness in marketing operations. To this end, we will:

- Strive to communicate clearly with all constituencies.
- Accept constructive criticism from customers and other stakeholders.
- Explain and take appropriate action regarding significant product or service risks, component substitutions or other foreseeable eventualities that could affect customers or their perception of the purchase decision.
- Disclose list prices and terms of financing as well as available price deals and adjustments.

Citizenship – to fulfill the economic, legal, philanthropic and societal responsibilities that serve stakeholders. To this end, we will:

- Strive to protect the ecological environment in the execution of marketing campaigns.
- Give back to the community through volunteerism and charitable donations.
- Contribute to the overall betterment of marketing and its reputation.
- Urge supply chain members to ensure that trade is fair for all participants, including producers in developing countries.

## Implementation

We expect AMA members to be courageous and proactive in leading and/or aiding their organizations in the fulfillment of the explicit and implicit promises made to those stakeholders. We recognize that every industry sector and marketing sub-discipline (e.g., marketing research, e-commerce, Internet selling, direct marketing, and advertising) has its own specific ethical issues that require policies and commentary. An array of such codes can be accessed through links on the AMA Web site. Consistent with the principle of subsidiarity (solving issues at the level where the expertise resides), we encourage all such groups to develop and/or refine their industry and discipline-specific codes of ethics to supplement these guiding ethical norms and values.